[No. A035682. First Dist., Div. Three. Jan. 12, 1988.]

RONALD PETRILLO, Plaintiff and Appellant, v.
BAY AREA RAPID TRANSIT DISTRICT et al., Defendants and
Respondents.

800

COUNSEL

Jack B. Burstein and Smith & Burstein for Plaintiff and Appellant.

Robert G. Heywood, Hanna, Brophy, MacLean, McAleer & Jensen and Richard B. Maness for Defendants and Respondents.

OPINION

MERRILL, J.—This is an appeal from a judgment denying a Bay Area Rapid Transit District (BART) police officer's petition for a writ of mandamus. The petition sought to compel BART either to direct the Board of Administration of the Public Employees Retirement System (PERS) to pay industrial disability retirement benefits to the officer or to reinstate the officer to his former position. We reverse the judgment for the reasons which follow.

I

On the afternoon of January 16, 1979, appellant, who had been a police officer for BART for six years, was dispatched to the Richmond BART

station. Upon his arrival, he found a woman who had suffered a seizure lying semiconscious on the floor. While examining the woman to determine if she was still breathing, he was suddenly assaulted by a male bystander. According to appellant, it took a half hour to subdue the man. He had to be wrestled, dragged and carried to the patrol car. In the process, appellant injured his back. After booking the suspect, appellant discovered he could no longer bend over. He managed to get into his vehicle and drive first to BART headquarters, then to Kaiser Emergency for treatment. Subsequent to this, appellant did not return to work. He has been under medical care for lower back and leg problems since that time.

Following the incident, appellant sought disability benefits. He filed an application for adjudication of claim with the Workers' Compensation Appeals Board (WCAB). Due to conflicts in the medical evidence, the Board referred appellant to an agreed medical examiner, Dr. Marvin Lipton. Dr. Lipton, an orthopedic surgeon, examined appellant on January 11, 1980, and issued a report to the Board the same day. In that report, Dr. Lipton indicated that appellant's condition was permanent, stationary and ratable. According to Dr. Lipton, appellant had suffered a "significant loss of motion" in his lower back. The doctor described appellant as "someone who would be precluded from heavy lifting, repeated bending and stooping." Lipton said, "It would be our feeling that if the patient felt he could tolerate the discomfort, it would not damage his back to go back to work as an officer within the job description. The problem would be, however, that the pain he would have might, in fact, affect his ability to protect himself and/or his co-workers. . . . If some job could be found within the limitations described herein where he has lost 50% of his pre-injury capacity for lifting, bending, and stooping . . . his back would not be placed at undue risk . . . ."

Thereafter, appellant applied to PERS for industrial disability retirement benefits as well. On the basis of Dr. Lipton's report, BART certified to PERS that appellant was incapacitated to perform his job. However, the district did not indicate whether or not appellant's injury was industrial in nature, that is, whether or not it had been industrially caused. Appellant would receive more in the way of disability retirement benefits if the injuries were industrial in nature. On July 15, 1980, appellant petitioned the WCAB for a finding on this issue and on August 26, 1980, PERS began providing appellant with nonindustrial disability retirement benefits pending a decision by the WCAB.

In the meantime, on April 15, 1980, BART advised appellant that his employment with the district would end April 18, 1980, and that his group medical, dental and life insurance benefits would terminate effective April

30, 1980. Subsequent to this, BART conducted an exit interview with appellant and appellant turned in his badge.

On October 6, 1980, BART deposed Dr. Lipton as a witness for purposes of the WCAB proceeding. At the deposition, BART's attorney showed the doctor a film of appellant working as a bread truck driver since he left the district. The film had been taken surreptitiously by a private investigator hired by BART. It showed appellant lifting and carrying bread trays which averaged approximately 30 pounds in weight. Appellant claimed that the film was taken during a period when he was forced to work because he had not as yet received any benefits. Dr. Lipton was asked to comment on the film. He said the film had changed his opinion with regard to the extent of appellant's disability. Lipton testified, "From the films we saw today, I found very little evidence objectively of any impairment of the lumbar spine, quite frankly." According to the doctor, "slight pain" would be the "maximum of [appellant's] impairment." Dr. Lipton saw no reason why appellant could not return to his job as a police officer.

In November 1980, the parties settled the WCAB case. Both sides stipulated to a 6 percent permanent disability rating. And BART stipulated that the disability was industrial in nature. Appellant notified PERS of the outcome of the case and again requested industrial disability retirement benefits. In response to the request, PERS wrote appellant informing him that such benefits had not been approved by BART and that the agency was unable to issue these benefits without BART's approval and "until their appeals are settled."

On February 10, 1981, appellant's attorney sent a letter to BART asking it to notify PERS that it had not appealed from the WCAB award and pointing out that the time for such an appeal had expired. BART responded to the letter in writing indicating its intent to discontinue appellant's disability retirement benefits altogether. The March 31, 1981, letter from BART said, "This action is based on additional medical evidence indicating that you are not restricted from performing the duties of your former position of Police Officer. Specifically, we refer to Dr. Lipton's statement in deposition taken October 6, 1980, wherein he indicates that he sees no reason why you could not return to your former position of police officer. [¶] Therefore, unless you provide evidence to the contrary by April 30, 1981, we will formally communicate our position to [PERS]." On April 25, 1981, appellant wrote BART objecting to the district's proposed action. On June 30,

1981, BART sent a written request to PERS to cancel appellant's disability retirement benefits, after which said benefits were terminated.[1]

At this point, appellant turned to other sources for assistance including the BART Police Officers' Association, the union which is the exclusive bargaining agent for BART police officers. However, no remedy appeared to be available to him. He was told by a union representative that "[i]t was not a union matter." Accordingly, appellant wrote BART a letter on July 29, 1981, requesting reinstatement to his former position as a district police officer. In that letter appellant said, "[A]gainst my own valition [sic] and contrary to medical advice, I am declaring that I am available to return to my former position as a BART police officer when so instructed by BART management." By letter dated August 17, 1981, BART responded that it would be willing to "consider" appellant's reemployment on the following conditions: "(1) Reemployment consideration would be that of rehire not reinstatement[;] (2) You will be required to compete with other applicants for selection in accordance with established Police Officer selection procedures[;] (3) If selected, you will be required to attend and successfully complete Police Officer Academy training[;] (4) Following successful Academy completion, you will be required to satisfactorily complete a one-year probationary period."

Appellant next filed the instant action seeking a writ of administrative mandamus under Code of Civil Procedure 1094.5 to compel BART either to authorize industrial disability retirement benefits in his behalf or to reinstate him to his former position. An alternative writ issued after which the case proceeded to trial. At the conclusion of trial, the trial court issued an order denying the petition for writ of mandate. Exercising its independent judgment on the evidence, the court agreed with BART's assertion that appellant is ineligible to receive disability retirement benefits inasmuch as he is no longer incapacitated to perform the duties of his former job. In its statement of decision, the court said that BART's offer to receive and consider evidence prior to terminating these benefits constituted adequate notice and opportunity for appellant to be heard on this issue of continuation of disability retirement benefits. As to the issue of reinstatement, the court held that appellant had failed to exhaust his administrative and contractual remedies by filing a grievance with the union. Appellant's motion for a new trial was denied. This appeal followed.

---

[1] BART acknowledges that appellant should have been paid industrial disability retirement benefits until such time as PERS terminated the benefits in accordance with BART's instructions, and the obligation to pay these benefits during this period is not an issue in this appeal.

## II

Prior to addressing the issues raised in this appeal, a summary of the pertinent statutes is in order.

█ The California State Retirement System is set forth in Government Code section 20000 et seq.[2] The general purpose of the system is "to prevent hardship to state employees who because of age or disability are replaced by more capable employees. The pension system serves as an inducement to enter and continue in state service [citation] and the provisions for disability retirement are also designed to prevent the hardship which might result when an employee who, for reasons of survival, is forced to attempt performance of his duties when physically unable to do so." (*Quintana* v. *Board of Administration* (1976) 54 Cal.App.3d 1018, 1021 [127 Cal.Rptr. 11], citing § 20001.) Section 21022 provides that "[a]ny patrol, state safety member, state industrial, state peace officer/firefighter, or local safety member incapacitated for the performance of duty as the result of an industrial disability *shall* be retired for disability . . . regardless of age or amount of service." (Italics added.) Section 21020 defines the terms "disability" and "incapacity for performance of duty" as a "disability of permanent or extended and uncertain duration, as determined by the board, *or in the case of a local safety member by the governing body of the contracting agency employing such member,* on the basis of competent medical opinion." (Italics added.)

". . . On receipt of an application for disability retirement of a member, other than a local safety member, the board shall, or of its own motion it may, order a medical examination of a member who is otherwise eligible to retire for disability to determine whether the member is incapacitated for the performance of duty. *On receipt of such application with respect to a local safety member, the board shall request the governing body of the contracting agency employing such member to make such determination.* [§ 21024, italics added.]

"If a member is entitled to a different disability retirement allowance according to whether the disability is industrial or nonindustrial and the member claims that the disability as found by the board, or in the case of a local safety member by the governing body of his employer, is industrial and such claim is disputed by the board, or in case of a local safety member by such governing body, the Workers' Compensation Appeals Board, using the same procedure as in workers' compensation hearings, shall determine whether such disability is industrial. [¶] The jurisdiction of the Workers'

---

[2] All statutory references are to the Government Code unless otherwise specified.

Compensation Appeals Board shall be limited solely to the issue of industrial causation . . . . [§ 21026.]

"The board, or in case of a local safety member the governing body of the employer from whose employment the person was retired, may require any recipient of a disability retirement allowance . . . to undergo medical examination, and upon his application for reinstatement, shall cause a medical examination to be made of any such recipient . . . . Such examination shall be made by a physician or surgeon, appointed by the board or such governing body of the employer, at the place of residence of the recipient or other place mutually agreed upon. Upon the basis of such examination the board or such governing body shall determine whether he is still incapacitated, physically or mentally, for duty in the state agency, the university, or contracting agency, where he was employed and in the position held by him when retired for disability, or in a position in the same classification, and for the duties of the position with regard to which he has applied for reinstatement from retirement. [§ 21028.]

"If the determination pursuant to Section 21028 is that the recipient is not so incapacitated for duty in the position held when retired for disability or in a position in the same classification or in the position with regard to which he or she has applied for reinstatement and his or her employer offers to reinstate that employee, his or her disability retirement allowance shall be canceled forthwith, and he or she shall become a member of the retirement system. [¶] If the recipient was an employee of the state or of the university and is so determined to be not incapacitated for duty in the position held when retired for disability or in a position in the same class, he or she shall be reinstated, at his or her option, to such a position. . . . [¶] If the recipient was an employee of a contracting agency other than a local safety member, the board shall notify it that his or her disability has terminated and that he or she is eligible for reinstatement to duty. The fact that he or she was retired for disability does not prejudice any right to reinstatement to duty which he or she may claim. [§ 21029.]" (§§ 21024-21029.)

It has been stipulated to by the parties that for purposes of the statute, appellant is a local safety officer and BART is a contracting agency.

## III

 Appellant contends that respondents violated his constitutional right to due process by not providing him with a hearing before terminating his disability benefits. BART claims that its March 31 letter to appellant notifying him of its tentative decision to terminate his benefits and providing him with 30 days in which to respond, satisfies the requirements of due

process. BART also apparently claims that appellant waived his right to a hearing by not requesting one. According to the district, had appellant requested a hearing, it would have provided him with one. We agree with appellant that his right of due process was violated in this instance.

Our California Supreme Court stated that "[i]n *Board of Regents* v. *Roth* (1972) 408 U.S. 564 [33 L.Ed.2d 548, 92 S.Ct. 2701], the United States Supreme Court 'made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money. [Fn. omitted.]' [Citation.] Rather, '[t]he Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests—property interests—may take many forms.' [Citation.]

"Expanding upon its explanation, the *Roth* court noted: 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

" 'Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law— rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.' [Citation.]" (*Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 206-207 [124 Cal.Rptr. 14 [539 P.2d 774].)

As noted above, section 21022 provides that any "local safety member incapacitated for the performance of duty as a result of an industrial disability shall be retired for disability . . . ." Section 21022, thus, clearly gives local safety members, like appellant, a vested right to disability retirement if they suffer a work-related disability. And such a right "constitutes a property interest protected by due process." (*Skelly* v. *State Personnel Bd., supra,* 15 Cal.3d at p. 207; see *Thompson* v. *City of San Diego* (1987) 43 Cal.3d 1033, 1038 [741 P.2d 613]; *Watkins* v. *City of Santa Ana* (1987) 189 Cal.App.3d 393, 396-397 [234 Cal.Rptr. 406] (review den. Apr. 29, 1987); and *Cansdale* v. *Board of Administration* (1976) 59 Cal.App.3d 656, 665 [130 Cal.Rptr. 880].)

BART apparently concedes that appellant's claim of entitlement to disability retirement benefits is protected by procedural due process. The

real issue between the parties is the extent of that protection and the type of procedure required.

■ "Procedural due process requires an individual be accorded notice and some form of hearing before he is deprived of a protected property or liberty interest. [Citation.] In other words, 'before a person is deprived of his life, liberty or property he must be given notice of the proceedings against him [citations], he must be given an opportunity to defend himself [citations], and the propriety of the deprivation must be resolved in a manner consistent with essential fairness. [Citations.]' [Citation.] Procedural due process requires 'fair play.' [Citation.]

"Although the fundamental requisite of due process of law is the opportunity to be heard, this right is meaningless unless one knows the matter is pending and can choose for himself whether to appear or default, acquiesce or contest. [Citation.] 'The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner"' [citations] and '[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [Citations.] The notice must be of such a nature as reasonably to convey the required information. . . . [¶] The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.' [Citation.]

■ "Due process, unlike other legal rules, is not a technical concept, fixed in content unrelated to time, place and circumstances. Rather, it is flexible enough to provide such procedural protections as the particular situation requires. [Citations.] . . . [¶] 'More precisely, . . . identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the physical administrative burdens that the additional or substitute procedure requirement would entail.' [Citation.]" (*People* v. *Swink* (1984) 150 Cal.App.3d 1076, 1079-1080 [198 Cal.Rptr. 290].)

■ Considering these factors in relation to the case at bench, we find as follows: Entitlement to disability retirement benefits when one has suffered a "disability of permanent or extended and uncertain duration" (§ 21020), is certainly a substantial interest. Such benefits provide a source

of income to a disabled worker who can no longer physically perform the duties of his existing job and who, due to the disability or lack of skills, may well be unable to perform the duties of other jobs as well, especially jobs at an equivalent salary level. Loss of these benefits could have severe effects upon the worker and his family. And while a disability retirement pension, unlike welfare payments, is not based on financial necessity alone, "deprivation of benefits may have substantially the same effect." (*American Federation of Labor* v. *Employment Dev. Dept.* (1979) 88 Cal.App.3d 811, 820 [152 Cal.Rptr. 193], fn. 5, citing *Mathews* v. *Eldridge* (1976) 424 U.S. 319 [96 S.Ct. 893]; see also *Laird* v. *Workers' Comp. Appeals Bd.* (1983) 147 Cal.App.3d 198, 203 [195 Cal.Rptr. 44].)

■ The risk of erroneous deprivation of a recipient's ongoing disability retirement benefits as a result of the procedures used by BART in this instance, is high. The March 31, 1981, letter which BART sent appellant notifying him of a change in "status" regarding his disability retirement fails to fully inform him of the action pending against him or to apprise him of his rights. The letter is, in fact, misleading. The subject correspondence informs appellant of the district's intention "to petition for discontinuance of your Disability Retirement benefits" and states, "[U]nless you provide evidence to the contrary by April 30, 1981, we will formally communicate our position to [PERS]." It thereby creates the erroneous impression that it is PERS rather than the district itself which will determine whether appellant continues to receive benefits and that the district, by way of a petition, would merely be taking an initial step in the process. This could have the effect of lulling a recipient such as appellant into a false sense of security in the belief that the letter is simply some kind of preliminary notice and that further notice and a hearing would be forthcoming. Under the pertinent statutes, "PERS is responsible merely for entering the *formal* decision granting or denying disability retirement benefits." (*Watkins* v. *City of Santa Ana, supra,* 189 Cal.App.3d at p. 396.) It does not act as the factfinder in the determination of capacity for job performance in the case of a local safety member working for BART; BART does, by express statutory grant of authority (§§ 21020, 21024). And as the agency responsible for determining disability, it is BART, not PERS, that is responsible for giving adequate notice and opportunity for a hearing.

Further, there is a substantial risk of error based on the fact that appellant's benefits were terminated solely on the basis of a film and a doctor's revised opinion concerning appellant's injuries after viewing the same. The film showed appellant working as a bread truck driver lifting and carrying bread trays. The fallibility of terminating benefits based on such evidence is reflected by the testimony of appellant himself. According to appellant, he took the job as a bread truck driver because he had not received any benefits

as yet and needed a job in order to support his family. He said he was able to endure the pain that he experienced in that job due to medication. Appellant testified, "Depending on the type of day I have, if I have, oh, a very busy day, there's more pain and I have to take more medication." Appellant's testimony raises the question of whether his ability to lift bread trays like the ones shown in the film was owing to his recovery from the disability or to a heavy dose of medication. This is the sort of question that a hearing might be expected to answer whereas a picture or film would not.

A trial-type hearing would not be required, but one which takes into consideration all of these factors. The burden on the district to provide such a hearing seems slight when weighed against the potential impact on the injured employee. " '. . . [W]hile it is true some increased costs are involved to a [governmental agency such as BART] in providing pretermination hearings and any benefits paid to ineligible recipients pending decision probably cannot be recouped, the [agency] may reduce these financial burdens by developing procedures for prompt pretermination hearings and by skillful use of personnel and facilities. Thus, the interest of the eligible recipient and the [agency] in assuring uninterrupted assistance outweighs the [agency's] competing concern to prevent any increase in its fiscal and administrative burdens.' [Citation.]" (*Laird* v. *Workers' Comp. Appeals Bd., supra*, 147 Cal.App.3d at p. 204.)

■ BART seems to argue that since appellant did not request a hearing, he waived the right to have one. BART's argument is without merit.

■ A waiver of a constitutional right is "not to be implied and is not lightly to be found." (*United States* v. *Provencio* (9th Cir. 1977) 554 F.2d 361, 363.) Waiver of a constitutional right must be knowing and voluntary. (See *Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464 [82 L Ed 1461, 1466, 58 S.Ct. 1019, 146 A.L.R. 357]; *Correa* v. *Nampa School Dist. No. 131* (9th Cir. 1981) 645 F.2d 814, 816-817.) ■ The facts in the instant case do not support the assertion that appellant knowingly waived his right to a hearing. The trial court did not make a finding that appellant was aware that he was entitled to a hearing, and BART never informed appellant that he was entitled to a hearing. In fact, BART did not have any established procedure at that time through which a hearing could be requested. Under these circumstances, it cannot be said that appellant waived his right to a hearing.

■ Nor do we agree with the trial court's finding that the failure of appellant to pursue a remedy through his union's grievance procedure precluded him from contesting the actions of BART in this instance. BART's department manager of employee relations, Lawrence Williams, testified at trial that BART had, as yet, made no provision for the required hearing,

either on its own or in conjunction with the union. According to Williams, there was no "apparatus" in existence at the time which "could generate an administrative record." As noted earlier, the record indicates that appellant did at one point request assistance from the union, but was told it was not a union matter.

BART also cites the case *Cansdale v. Board of Administration, supra,* 59 Cal.App.3d 656, for the proposition that a pretermination hearing is not required prior to terminating a recipient's disability retirement benefits. However, BART's reliance on *Cansdale* is misplaced. The Court of Appeal in its ruling did not deny that the recipient had a right to a hearing at some juncture in the proceeding. In fact, the court stated that "[t]he rule, of course, is well established that before a person may be deprived of any significant property interest, he must be afforded notice and an opportunity for a hearing . . . [citations]." (*Id.,* at p. 665.) What the court held was that under the particular facts of that case a posttermination hearing provided the recipient with due process because if he had prevailed at the posttermination hearing he would have been entitled to full retroactive relief. For that reason a reversal for failure to provide him with an opportunity for a pretermination hearing was not warranted.

## IV

It will be remembered that the issue of whether appellant's disability was industrially caused was left to the WCAB. During the WCAB proceeding, both sides stipulated to a 6 percent permanent disability rating and industrial causation. Appellant seems to argue that the WCAB findings had res judicata effect on the issue of whether or not he was incapacitated to perform the duties of his position as a BART police officer. Appellant's argument is without merit.

" '[I]ncapacitated for the performance of duty' within the meaning of Government Code section 21022 means the *substantial* inability of the applicant to perform his usual duties. [Citation.]" (*Cansdale v. Board of Administration, supra,* 59 Cal.App.3d at pp. 664-665.) "[W]here there are permanent light duty assignments and a person who becomes 'incapacitated for the performance of his duty . . . ,' that person should not be retired if he can perform duties in a given permanent assignment within [his] department. He need not be able to perform any and all duties performed by [persons in his job category]. Public policy supports employment and utilization of the handicapped. [Citation.] If a person can be employed in such an assignment, he should not be retired with payment of a disability retirement pension." (*Craver v. City of Los Angeles* (1974) 42 Cal.App.3d 76, 79-80 [117 Cal.Rptr. 534].)

 As can be seen from this, the determinations to be made by the WCAB and the board or, as in the case at hand, the contracting agency, are different. The fact that it was determined in the WCAB proceeding that appellant has a 6 percent permanent disability does not preclude a finding by BART that appellant is capable of performing the duties to which he may be assigned. (See *Winn* v. *Board of Pension Commissioners* (1983) 149 Cal.App.3d 532, 536-541 [197 Cal.Rptr. 111].) Accordingly, there can be no res judicata or collateral estoppel from the WCAB findings.

Further support for this conclusion is provided by section 21026, the pertinent part of which states: "The jurisdiction of the Workers' Compensation Appeals Board shall be limited solely to the issue of industrial causation . . . ."

V

The judgment is reversed. The trial court is directed to issue a writ of mandate compelling respondents (1) to vacate their decision to terminate appellant's disability retirement benefits, and (2) to afford appellant a hearing on whether his disability retirement benefits should be terminated, and if it is determined that his disability retirement benefits should be terminated, whether his application for reinstatement should be granted. Appellant shall recover costs on appeal.

White, P. J., and Barry-Deal, J., concurred.

A petition for a rehearing was denied February 5, 1988.