Filed 11/29/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CITY OF OAKLAND,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>OAKLAND POLICE AND FIRE<br>RETIREMENT SYSTEM et al.,<br><br>      Defendants,<br><br>RETIRED OAKLAND POLICE<br>OFFICERS ASSOCIATION et al.,<br><br>      Interveners and Appellants. | A144653<br><br>(Alameda County<br>Super. Ct. No. RG11580626) |

Following this court's published decision in *City of Oakland v. Oakland Police & Fire Retirement System* (2014) 224 Cal.App.4th 210 (*OPFRS*)—which involved the legitimacy of certain retirement benefits regularly paid by the Oakland Police and Fire Retirement Board (Board) to members and beneficiaries of the Oakland Police and Fire Retirement System (PFRS)—the Retired Oakland Police Officers Association, along with several individual PFRS pensioners (collectively, the "Association") sought attorney fees in the trial court. Specifically, the Association—interveners in the underlying action— claimed an entitlement to fees under both California's private attorney general statute, Code of Civil Procedure section 1021.5 (section 1021.5), and section 1988 of the federal Civil Rights Attorneys' Fees Award Act of 1976, 42 U.S.C. § 1988 (section 1988). After considering the matter at some length, the trial court determined that fees were not warranted under either statute. On appeal, many of the trial court's numerous conclusions made in connection with its denial of fees are disputed either by the

1

Association or by respondent City of Oakland (City).  We have considered the arguments raised by both parties, and deem an award of attorney fees under section 1021.5 to be proper.  We therefore reverse and remand the matter so that the trial court can determine the appropriate amount of such an award, consistent with our conclusions herein.[1]

## I.  BACKGROUND

"PFRS was created in 1951 when separate police and fire retirement systems were merged pursuant to article XXVI of the Oakland City Charter (Charter).  (Charter, art. XXVI, § 2600.)  Only members of the Oakland Police Department (Department) or Oakland Fire Department hired prior to July 1, 1976, are eligible for coverage by PFRS." (*OPFRS*, *supra*, 224 Cal.App.4th at p. 216.)  "Pursuant to the terms of the Charter, PFRS is managed and administered by the Board, which has 'exclusive control of the administration and investment' of all PFRS funds." (*Ibid.*)  As we summarized in *OPFRS*:  "In a fixed pension system, benefits are paid to a retiree based on the compensation paid to that retiree for a defined period of time prior to retirement.  [Citation.]  PFRS, in contrast, is a 'fluctuating' system under which pension benefits paid to retired members increase or decrease over time as the compensation paid to active members of the Department similarly rises or falls.  [Citations.]  The primary purpose of a fluctuating pension plan such as PFRS 'is to guarantee the pensioner a fairly constant standard of living despite inflation, and to maintain equality of position between the retired member and the person (or persons) currently holding the rank the pensioner attained before his retirement.'  [Citation.]  Thus, a PFRS retiree receives benefits based on the compensation currently paid to active sworn personnel who hold the rank that the member held prior to retirement.  Stated in terms of the applicable Charter language, the retiree receives benefits based on the current compensation that is 'attached to the

_____

[1] At oral argument in this matter, both parties agreed that, should we order fees in this case pursuant to section 1021.5, we need not reach the issue of whether a fee award was also appropriate pursuant to section 1988.  We therefore do not consider this question.

2

average rank held' by that retiree in the three years prior to retirement." (*Id.* at pp. 216–217.)

"On June 14, 2011, the City filed a petition for writ of mandate and complaint for declaratory relief against PFRS and the Board in Alameda County Superior Court. In its papers, the City claimed that the Board was overcompensating PFRS retirees in four specific ways: (1) by paying retirees at an excessive rate for holidays; (2) by paying retirees for too many holidays; (3) by including shift differential pay in the calculation of retiree benefits; and (4) by paying retirees who retired above the rank of captain at an excessive rate for holidays." (*OPFRS*, *supra*, 224 Cal.App.4th at pp. 224–225.) The City later dropped its fourth contention. (*Id.* at p. 225, fn. 6.) "PFRS and the Board filed their answer on August 1, 2011, disputing all of the City's overpayment claims. On August 24, 2011, the trial court granted the Association leave to intervene, and on August 29, 2011, the Association filed its complaint in intervention, joining PFRS and the Board in contesting the City's allegations." (*Id.* at p. 225.) In August 2012, the trial court granted the City's writ petition with respect to all three types of benefits described above. In particular, the court "ordered prospective relief and directed the Board to collect any overpayments, subject to the applicable statute of limitations." (*Ibid.*) The Board, PFRS, and the Association all appealed, but PFRS and the Board subsequently reached a settlement with the City and, at their request, were dismissed from this action. (*Id.* at p. 215, fn. 1.)

Our opinion in *OPFRS* largely reversed the trial court's decision with respect to those questions that were brought before us for resolution. (See *OPFRS*, *supra*, 224 Cal.App.4th at pp. 227–249.) On the holiday pay rate issue, we concluded that the trial court erred in finding that the holiday premium pay received by active members of the Department is not " 'compensation attached to rank' " for purposes of the calculation of PFRS retirement benefits. (*Id.* at pp. 227–233.) Specifically, we held that the doctrine of res judicata required the continued treatment of such pay as compensation attached to rank because prior litigation had reached this result and there were "no intervening changes in facts or law that would justify a reexamination of the same issue between the

3

same parties." (*Id.* at p. 233.) In making this determination, we expressly rejected the City's argument that certain changes to the language in the then-current memorandum of understanding (MOU) altered pensioners rights with respect to holiday premium pay and further concluded that "the fact that the right of active members to receive holiday premium pay for working on holidays has been contained in a series of salary ordinances and MOU's over the years is essentially irrelevant." (Id. at pp. 229–230.) We also rejected the trial court's conclusion, based on its broad reading of *Kreeft v. City of Oakland* (1998) 68 Cal.App.4th 46 (*Kreeft*), that *any* variability in a benefit paid to active members of the Department disqualifies such benefit from being considered compensation attached to rank under the Charter. (*OPFRS*, *supra*, 224 Cal.App.4th at p. 232 & fn. 12.)

Although the Association declined to appeal the trial court's determination that shift differential pay is not compensation attached to rank for pension purposes, it did argue: that the trial court should not have considered the question because the City had failed to exhaust available administrative remedies; that the trial court improperly considered extra-record evidence in making its shift differential decision; and that, regardless, the Board should be barred from collecting any past overpayments related to shift differential pay on equitable grounds. (See *OPFRS*, *supra*, 224 Cal.App.4th at pp. 234–246.) While we rejected the Association's procedural arguments, we agreed that equitable estoppel applied on the facts presented, barring recovery of significant overpayments related to the past inclusion of shift differential pay in compensation attached to rank. (*Ibid.*) In reaching this conclusion, we expressly held, that—under the terms of the Charter and to the extent permitted by section 17 of article XVI of the California Constitution—"the Board has discretion to decide whether, how and to what extent any overpayments made to PFRS retirees should be repayable to PFRS" and that a refusal to mandate the return of any overpayments under such circumstances would not constitute an unconstitutional gift of public funds. (*OPFRS*, *supra*, 224 Cal.App.4th at pp. 243–246.)

4

Finally, with respect to alleged pension overpayments related to the number of designated holidays included in compensation attached to rank for the 2009, 2010, and 2011 fiscal years, the Association, again, declined to appeal the underlying merits, asserting only that PFRS pensioners should not be required to return any overpayments they received based on this error for equitable reasons. (See *OPFRS*, *supra*, 224 Cal.App.4th at p. 247.) Noting that the improper payments at issue were not substantial and were time-limited based on the terms of the applicable MOU, we found no grounds for equitable relief with respect to these overpayments. (*Id.* at pp. 247–249.) However, we further opined: "[T]he trial court in this case ordered the Board 'to develop and implement a plan to recover the overpayments' made to PFRS retirees. To the extent this order mandates that the Board act in a particular manner with respect to the identified overpayments, it was error. Rather, . . . the Board has discretion regarding how its miscalculations should be handled. The matter should therefore be remanded to the Board so that it can exercise this discretion subject, if necessary, to additional judicial review." (*Id.* at p. 249.)

Thereafter, in May 2014, the Association filed the instant motion for attorney fees in the trial court pursuant to section 1021.5 and section 1988, seeking approximately $580,000 in attorney fees as a prevailing party in the litigation. The court denied fees under both statutes in an extensive decision filed on March 25, 2015. Specifically, the trial court rejected section 1988 as a basis for an attorney fee award on numerous grounds. In contrast, the trial court concluded that the Association met all of the criteria for an attorney fee award under section 1021.5 with one exception: It believed that the Association could not establish that the "financial burden of private enforcement . . . [was] such as to make the award appropriate." (§ 1021.5.) In response, the Association timely appealed, bringing the matter before this court for a second time.

## II. DISCUSSION

### A.  *Statutory Framework and Standards of Review*

"Section 1021.5 codifies California's version of the private attorney general doctrine, which is an exception to the usual rule that each party bears its own attorney

5

fees. [Citation.] The purpose of the doctrine is to encourage suits enforcing important public policies by providing substantial attorney fees to successful litigants in such cases." (*Robinson v. City of Chowchilla* (2011) 202 Cal.App.4th 382, 390 (*Robinson*).) In particular, "[t]he doctrine rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible." (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 933 (*Woodland Hills*).) In short, section 1021.5 is focused "on solving the problem of the nonaffordability of litigation that will benefit the public *but cannot pay its own way*." (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1224 (*Whitley*), italics added.)

As is relevant to the case at hand, section 1021.5 provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. . . ." Since section 1021.5 states the criteria supporting a grant of fees in the conjunctive, "each element must be satisfied to justify a fee award." (*Children & Families Com. of Fresno County v. Brown* (2014) 228 Cal.App.4th 45, 55 (*Children & Families*).) However, this is not a purely objective analysis. Rather, in considering a fee request made pursuant to section 1021.5, the trial court, " ' "[utilizing] its traditional equitable discretion," . . . "must *realistically* assess the litigation and determine, *from a practical perspective*" [citation] whether or not the statutory criteria have been met.' " (*Summit Media, LLC v. City of Los Angeles* (2015) 240 Cal.App.4th 171, 187, italics added (*Summit Media*); see also *Heron Bay Homeowners Assn. v. City of San Leandro* (2018) 19 Cal.App.5th 376, 386 (*Heron Bay*).)

6

Generally speaking, a trial court's decision whether to award attorney fees under section 1021.5 is reviewed for abuse of discretion. (*Samantha C. v. State Dept. of Developmental Services* (2012) 207 Cal.App.4th 71, 78.) However, " ' "de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law." ' " (*Whitley*, *supra*, 50 Cal.4th at p. 1213.) Thus, "[o]n appeal, 'we must pay " 'particular attention to the trial court's stated reasons in denying or awarding fees and [see] whether it applied the proper standards of law in reaching its decision.' " ' [Citation.] 'The pertinent question is whether the grounds given by the court . . . are consistent with the substantive law of . . . section 1021.5 and, if so, whether their application to the facts of this case is within the range of discretion conferred upon the trial courts under section 1021.5, read in light of the purposes and policy of the statute.' " (*County of Colusa v. California Wildlife Conservation Bd.* (2006) 145 Cal.App.4th 637, 648.)

**B.** **Entitlement to Attorney Fees Under Section 1021.5**

The Association argues on appeal that the trial court committed legal error in refusing to consider the financial situation of the Association and its members when analyzing the financial burden of enforcement for purposes of a fee award under section 1021.5. The City unsurprisingly disagrees. Moreover, the City additionally avers that the trial court erred in finding that the Association met certain other prerequisites for a section 1021.5 fee award: that the Association was a prevailing party; that the Association, through this litigation, enforced important rights affecting the public interest; and that the litigation resulted in a significant benefit being conferred on the general public or a large class of persons. We address each of the challenged criterion in turn, beginning with the "financial burden" analysis, which, as stated above, was the basis for the denial of section 1021.5 fees in the trial court.

*1.* *Financial Burden of Private Enforcement*

Pursuant to section 1021.5, fees may be awarded only if the "financial burden of private enforcement . . . [is] such as to make the award appropriate." The trial court in

7

the present case concluded that an award of attorney fees was not warranted because the pensioners represented by the Association had a significant financial incentive to initiate the litigation and the ability to spread the litigation costs among themselves. In reaching this result, however, the court deemed itself barred from considering the relative poverty of either the Association or it members. It also failed to consider certain other circumstances related to the monetary recovery generated by the Association's success in this case. We believe both to be error.

"In determining the financial burden on litigants, courts have quite logically focused not only on the costs of the litigation but also [on] any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield. ' "An award on the 'private attorney general' theory is appropriate when the cost of the claimant's legal victory transcends [the claimant's] personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his [or her] individual stake in the matter.' [Citation.]" ' (*Woodland Hills*, *supra*, 23 Cal.3d at p. 941.) 'This requirement focuses on the financial burdens and incentives involved in bringing the lawsuit.' " (*Whitley, supra*, 50 Cal.4th at p. 1215; see also *Children & Families*, *supra*, 228 Cal.App.4th at p. 55 [quoting *Whitley*].)

In *Whitley*, our high court cited with approval the method for weighing costs and benefits of litigation that was used in *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1 (*Police Protective League*) to determine eligibility for a fee award under section 1021.5. First, a court must estimate the expected monetary value of the case at the time the party seeking fees made vital litigation decisions.[2] (*Whitley*,

---

[2] Although some of the language from *Police Protective League* quoted in *Whitley* could be read as requiring the starting point for the financial burden analysis to be the monetary value of benefits *actually obtained* by the party seeking a fee award, we agree with the appellate court in *Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140 (*Collins*) that *Whitley*, when read as a whole, instead requires consideration of the monetary value of the benefits that the successful litigant *reasonably expected to obtain*. (See *Collins*, *supra*, 205 Cal.App.4th at p. 154 & fn. 10; see also *Whitley*, *supra*, 50 Cal.4th at p. 1220 ["[I]n assessing the financial burdens and benefits in the context of section 1021.5, we are evaluating incentives rather than outcomes. ' "[W]e do not

8

*supra*, 50 Cal.4th at pp. 1215, 1220.)  The focus is on the litigant's *expected recovery* at the time litigation decisions are being made because section 1021.5 "is intended to provide an incentive for private plaintiffs to bring public interest suits when their personal stake in the outcome is insufficient to warrant incurring the costs of litigation.' " (*Whitley, supra*, 50 Cal.4th at pp. 1220–1221.)  Once the expected monetary value is determined, a court must next discount that value by " 'some estimate of the probability of success at the time the vital litigation decisions were made which eventually produced the successful outcome.' " (*Id.* at p. 1215.)  As a third step, the court making the fee decision must determine " 'the costs of the litigation—the legal fees, deposition costs, expert witness fees, etc., which may have been required to bring the case to fruition.' " (*Id.* at pp. 1215–1216.)  Finally, the court must " 'place the estimated value of the case beside the actual cost and make the value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in this case.' " (*Id.* at p. 1216.)

The final "value judgment" that *Whitley* requires when analyzing the financial burden of the litigation appears to encompass the criterion set forth in subdivision (c) of section 1021.5 that a court considering fees must determine whether "such fees should not in the interest of justice be paid out of the recovery, if any."  Indeed, *Police Protective League*—the case whose methodology was cited by the high court in *Whitley*—states that all of the section 1021.5 factors are "interrelated" and expressly treats the financial burden criterion and the interests of justice criterion together.  (*Police Protective League, supra*, 188 Cal.App.3d at pp. 10–11; see also *Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1407, 1417 (*Beasley*) [noting interdependence of "financial burden" criterion and "interest of justice" criterion], disapproved on another ground as stated in *Olson v. Automobile Club of Southern California* (2008) 42 Cal.4th 1142, 1151– 1157 & fn. 6.)  Thus, while, generally speaking, " '[a] bounty will be appropriate except

---

look at the plaintiff's *actual* recovery after trial, but instead we consider 'the estimated value of the case at the time the vital litigation decisions were being made.' " ' "].)

9

where the expected value of the litigant's own monetary award exceeds by a substantial margin the actual litigation costs' " (*Whitley, supra*, 50 Cal.4th at p.1216, quoting *Police Protective League*), the interrelatedness of the section 1021.5 factors "means the court sometimes should award fees even in situations where the litigant's own expected benefits exceed its actual costs by a substantial margin." (*Police Protective League*, *supra*, 188 Cal.App.3d at p. 10.)

Turning to the financial burden analysis in this case, we have no quarrel with the trial court's use of $500,000 as the estimated total cost of litigation and 33 percent as the discount factor based on the Association's estimated probability of success at the time that vital litigation decisions were being made. Both numbers appear well supported by the record and have not been challenged by the parties. We do agree with the Association, however, that the $39,000,000 estimated monetary value of the case posited by the trial court appears to be significantly exaggerated.

The trial court arrived at its estimated value by reasoning that the Association, through its litigation efforts, was hoping to retain the right for all affected pensioners to receive ongoing annual pension payments of $3,833,000 based on the prospective inclusion of both holiday pay and shift differential pay as compensation attached to rank for pension purposes. In addition, the court opined that the pensioners were hoping to avoid repayments of approximately $20,000,000 involving shift differential pay and holiday pay that the City alleged had been improperly included in their pensions in the past. The court then added the sum of five years of prospective annual payments ($19,165,000) to the potential repayment amount ($20,000,000), and concluded that "at the inception of the litigation [the Association] was seeking to protect the rights of its members to collect or retain approximately $39,000,000."

While it is possible to challenge many of the assumptions underlying the trial court's estimated value calculation, we mention only two. First, it appears that the trial court may have overstated the amount of overpayments related to shift differential pay that the Association reasonably believed was at issue in this litigation by approximately $12,000,000. The trial court used $16,662,758 in its calculations, the amount of shift

differential pay estimated to have been improperly included in retirement benefits paid to pensioners from April 2002 through March 2014.  However, this District has previously held in the pension context that the three-year statute of limitations for relief on grounds of mistake set forth in Code of Civil Procedure section 338, subdivision (d), applies to claims for the recovery of public money paid out in error.  (*County of Marin Assn. of Firefighters v. Marin County Employees Retirement Assn.* (1994) 30 Cal.App.4th 1638, 1650–1653.)  The three years for filing suit runs from the date the aggrieved party either actually discovered, or reasonably should have discovered, its mistake.  (See Code Civ. Proc., § 338, subd. (d); *Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 350.)  While the record is silent as to when the City *actually* became aware of the shift differential problem before it filed suit in July 2011, our discussion of the issue in *OPFRS* makes clear that it reasonably should have known about the problem for years, perhaps even as early as 2002 when it endorsed the conclusion that shift differential pay would replace line-up pay for purposes of pension calculations.  (*OPFRS*, *supra*, 224 Cal.App.4th at pp. 221–222, 239–242.)  Assuming that the City should reasonably have been aware of the issue in the years prior to the filing of its July 2011 writ petition—as each challenged individual pension payment was made—any ordered recovery of erroneous payments likely would have been limited to pension payments made within three years of the commencement of this litigation.  Under this scenario, the amount of repayments reasonably at risk with respect to the shift differential pay error would not be $16,662,758, but rather approximately $4,500,000 (three years at a rate of $1,500,000 per year).[3]  The trial court, itself, recognized this possibility.

Next, as we mentioned in *OPFRS*, current members of the Department do not belong to PFRS.  "Thus, PFRS is essentially a closed system with a dwindling pool of retirees.  As of January 31, 2012, PFRS had 619 retired police members and widows,

---

[3] We use an annual number of $1.5 million in calculating the amount of potential shift differential-based repayments the pensioners could reasonably have hoped to avoid by pursuing this case as that is the number that was available at the time vital litigation decisions were being made.

with an average age of 73." (*OPFRS*, *supra*, 224 Cal.App.4th at p. 216.) The Association, in contrast, had only 230 members as of October 2012, less than half of the extant pensioners.[4] Despite this fact, the trial court concluded that the Association was prosecuting the matter on behalf of *all* affected pensioners, a number which it set at 590, the number of pensioners still living at the time the court considered this fee motion. However, since the Association is a membership organization, precedent dictates that its financial stake in this matter was the same as that of its membership. (See *California Redevelopment Assn. v. Matosantos* (2013) 212 Cal.App.4th 1457, 1479–1480; *California Licensed Foresters Assn. v. State Bd. of Forestry* (1994) 30 Cal.App.4th 562, 570 (*California Licensed Foresters*).) If the trial court's estimated monetary value of $39,000,000 is decreased by the $12,000,000 previously mentioned, and then discounted by the 33 percent probability of success, the total estimated monetary value for *all* affected pensioners would be approximately $9,000,000 ($27,000,000 x .33 = $8,910,000). Approximating the total number of living pensioners at the time vital litigation decisions were being made at 600, based on the figures set forth above, this is $15,000 per pensioner ($9,000,000/600 = $15,000). Based on these assumptions, the total estimated value of the case for the Association and its membership would be no more than $3,500,000 ($15,000 x 230 = $3,450,000), significantly less than the $13,000,000 adopted by the trial court.

We recognize that $3,500,000 is still significantly more than the estimated trial costs of $500,000 in this case and that, generally speaking, a fee award under section 1021.5 is not appropriate " 'where the expected value of the litigant's own monetary

---

[4] At the February 2015 hearing on the fee motion, counsel for the Association represented that the Association had 190 members in December 2010 and 363 members in December 2012. The City objected that these numbers were not a part of the record, but stated that it had no reason to dispute them. While we recognize that this number is something of a moving target—and varied during the time vital litigation decisions were being made in the summer of 2011 and the fall of 2012—we will use the 230 number provided to this court as part of the Association's October 2012 petition for writ of supersedeas.

award exceeds by a substantial margin the actual litigation costs.' " (*Whitley, supra*, 50 Cal.4th at p. 1216, quoting *Police Protective League*.) We are also aware that, in an attempt to further narrow this margin, we could recalculate every other potentially questionable component underlying the trial court's estimate of monetary value. (*Police Protective League*, *supra*, 188 Cal.App.3d at p. 11 ["when an appellate court spots a questionable estimate or a faulty calculation it need not shrink from the task of correcting this element of the equation and reassessing whether that change alters the ultimate result"].) We need not do so, however, because, as stated above, a "court sometimes should award fees even in situations where the litigant's own expected benefits exceed its actual costs by a substantial margin." (*Id.* at p. 10.) We believe this is just such an unusual case. In other words, even with estimated value numbers substantially exceeding costs, when we place the estimated value of this case beside the actual cost and make that final " 'value judgment' " mandated by *Whitley*, we see several reasons why it would be " 'desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in this case.' " (*Whitley*, *supra*, at p. 1216.) And, in a related vein, we are similarly persuaded that "such fees should not in the interest of justice be paid out of the recovery, if any." (§ 1021.5, subd. (c).)

For instance, the trial court expressly found the following: that the Association is an entirely voluntary organization; that the Association has difficulty communicating with its elderly members, many of whom are scattered throughout the United States, lack internet access, live in care homes, have not provided telephone numbers, and/or have turned their finances over to others; that, prior to engaging in this litigation, the Association's limited staff were only able to speak to a few dozen pensioners and could not reasonably have obtained financial commitments from its membership; that the Association had carefully set its membership dues at $15/month, believing that charging more would have significantly impaired its ability to attract members; that, given the extent of the pension cuts pensioners were facing, at least one member had resigned from the Association, stating that he needed to save money for himself rather than fund the litigation; and that the Association did not have the authority to assess its members more

13

than $100 without a membership vote. Moreover, although we agree with the trial court that it was appropriate to consider avoidance of financial loss when determining the estimated monetary value of the litigation, it is clear that the hoped-for monetary recovery in this case was not of the kind that could easily be accessed to fund the litigation. Rather, the Association's members were attempting to avoid significant repayments of pension benefits they likely had already allocated and to lessen their expected losses going forward. In short, no new money was on the table and, even if the Association was largely successful, the affected pensioners would almost certainly still be facing some future cuts and required repayments. (See *Heron Bay, supra*, 19 Cal.App.5th at pp. 388–389 [noting that courts must " 'realistically assess' " litigation from a " 'practical perspective,' " and observing that "a 'plaintiff who expects a lawsuit to result in avoiding a financial loss may have more difficulty financing the lawsuit because the plaintiff would still need to pay the lawyer out of his or her now [un]diminished assets' "].) Although these facts were all uncontradicted—and support the notion that the litigation was financially infeasible for the Association absent the prospect of a fee award—the trial court refused to rely on them as a basis for granting fees.[5]

Additionally, in declining to award attorney fees under section 1021.5 in this case, the trial court expressly indicated that it could not consider the financial situation of either the Association or it members in making its fee determination, despite the obvious

---

[5] Instead, although it acknowledged the difficulties in attracting counsel given the type of financial "recovery" hoped for in this case, the trial court went on to posit that the Association reasonably could have assessed all affected pensioners to fund the litigation, could have obtained commitments up front from the pensioners to fund the litigation out of any financial benefits actually obtained, or could have requested pensioners to share some of their now-quantifiable financial benefits after the conclusion of the case. None of these scenarios were feasible on this record, however, and the trial court, itself, admitted they were all "counterfactual." In the end, the court appears to have denied fees based simply on its belief that spreading the costs of the litigation among the affected pensioners (at less than $1000 each) would have been objectively reasonable given the amount of their anticipated recovery, while ignoring the fact that the Association had absolutely no ability to do so.

14

relevance of this factor to the financial feasibility of the litigation. Indeed, during a hearing on the Association's fee request, the court opined: "As a factual matter, I will just state that you have made a compelling case for financial difficulty of the plaintiffs. And even go as far to say, if I thought that was something the court could consider, I would weigh it, and perhaps quite heavily, because, I mean, you presented a picture of these pensioners who are older, who don't have a lot of money for whom payment of fees would be a hardship. It just—unfortunately, I can't consider that." The trial court based its position on a statement from *Whitley*, *supra*, 50 Cal.4th at p. 1219, that " '[s]ubstantial benefits to the general public should not depend upon the financial status of the plaintiff.' " Several earlier cases had used similar language. (See *American Federation of Labor v. Employment Dev. Dept.* (1979) 88 Cal.App.3d 811, 822 (*AFL*) [rejecting argument that union plaintiffs were "well able to meet the costs" of the action by stating, without citation to any authority, that "the code does not make financial status of the prevailing party the criteria for awarding fees"]; see also *Citizens Against Rent Control v. City of Berkeley* (1986) 181 Cal.App.3d 213, 231 (*Citizens*) [citing *AFL* in stating: "The inquiry is whether respondents had an *individual stake* that was out of proportion to the costs of the litigation . . . , not whether they were financially able to bear the costs. Financial status is not a criterion."].)

We do not, however, read these cases to suggest that a party's poverty is irrelevant to a section 1021.5 fee analysis when it acts as a barrier to financing litigation of benefit to the public. First, the statement in *Whitley* is part of a larger passage taken from the legislative history of section 1021.5, which the high court cited in support of its argument that section 1021.5 is focused on financial feasibility. (*Whitley*, *supra*, 50 Cal.4th at p. 1219.) It reads in full as follows: " '[I]t is extremely difficult to entice private lawyers and law firms, even the most public spirited, to devote substantial time and money to vindicate public rights when it means that they will have no chance whatsoever to recoup their fees and costs. If these attorneys and law firms felt there was a possibility of getting fees on those successfully litigated cases which confer a substantial benefit on a broad segment of the public, we would be far more successful in getting attorneys to engage in

15

public interest litigation. . . . [¶] *[S]ubstantial benefits to the general public should not depend upon the financial status of the plaintiff or upon the charity of foundations or upon the charity of public-minded lawyers alone.* Where the benefit is conferred upon a large number of persons, it is inequitable that a person who steps forward to enforce the rights should bear the entire cost.' " (*Ibid.*, italics added.) When taken in context, it is clear that this statement means only that the fee statute is necessary because, without it, public interest litigation must unfairly rely on rich litigants, charitable organizations, or pro bono attorneys to move forward. It says nothing about the plight of poor litigants.[6]

Similarly, the statements in both *AFL* and *Citizens* regarding the irrelevance of financial status were made as a basis for rejecting the argument that a litigant's apparent *wealth* should preclude a fee award under section 1021.5. As stated above, the *AFL* court was responding negatively to the contention that two large union plaintiffs—the AFL-CIO and United Steelworkers of America—were "well able to meet the costs" of the action and thus an award of fees was improper. (*AFL*, *supra*, 88 Cal.App.3d at p. 822.) And the *Citizens* court was rejecting the claim that the prevailing parties' receipt of voluntary financial contributions to the ongoing litigation from nonparties—which arguably gave them the ability to absorb litigation costs—should be considered in a financial burden analysis. (*Citizens*, *supra*, 181 Cal.App.3d at p. 231; cf. *Summit Media*, *supra*, 240 Cal.App.4th at p. 191 [rejecting argument that the trial court improperly considered the plaintiff's wealth in denying fees under section 1021.5; "[p]laintiff's suggestion that the trial court's ruling was based on plaintiff's ability to pay . . . has no support in the record"].) These holding are thus in line with the legislative history quoted

---

[6] The trial court also cited *Whitley*'s comment that the "proper subject" of the financial burden inquiry is a plaintiff's "objective financial incentives." (*Whitley*, *supra*, 50 Cal.4th at p. 1221.) But the issue resolved by *Whitley* was whether nonfinancial, nonpecuniary personal interests can disqualify a litigant from a fee award under section 1021.5, and the Supreme Court was simply distinguishing objective financial incentives from *subjective motives* in concluding that the later had no place in a section 1021.5 analysis. (*Id.* at pp. 1211, 1220–1221.) Moreover, a focus on objective financial incentives does not, in our view, preclude consideration of a litigant's relative poverty.

16

by the *Whitley* court to the effect that wealthy benefactors should not have to foot the bill for public interest litigation which benefits a large number of persons. In other words, all of these cases stand simply for the following rather unremarkable proposition: Just because wealthy litigants can afford public interest litigation doesn't mean they should have to pay for it where the other factors authorizing a fee award under section 1021.5 are present.[7]

In contrast, a number of other cases have expressly mentioned poverty as a permissible factor to consider in determining whether the financial burden of the litigation was sufficient to merit a fee award. Most notably, the Supreme Court in *Woodland Hills* discussed a contention by the defendants that the litigation expenses did not place a "disproportionate burden" on the plaintiffs and thus a fee award under section 1021.5 was improper. (*Woodland Hills*, *supra*, 23 Cal.3d at p. 941.) The plaintiffs directly challenged this claim before our high court, "pointing out that in defense of their attorney fee motion they *introduced evidence to demonstrate that their fiscal resources [were] minimal*, that their personal financial interest in the present action [were] small and that the litigation expenses entailed in actions of this type are considerable." (*Ibid.*, italics added.) Because the trial court had made no findings on this issue, the Supreme Court remanded the case, stressing that, "on remand, the parties should be permitted to

---

[7] We acknowledge that *California Licensed Foresters*, *supra*, 30 Cal.App.4th 562, could be read as supporting the conclusion that the relative poverty of a prevailing party is irrelevant to the financial burden analysis. (*Id.* at p. 570.) What *California Licensed Foresters* really holds, however, is that the California Licensed Forrester Association (CLFA)—the nonprofit association pursuing fees in that case—was essentially a shell organization that should be viewed as having the same financial stake in the litigation as its members. (*Ibid.*) Since the CLFA members had "significant pecuniary concerns" and the costs of litigation at $60 per member were low, the CLFA and its members "require[d] no further incentive for bringing suit." (*Id.* at pp. 569, 572.) In reaching this decision, the court noted that the CLFA's limited ability to bear the costs of litigation on its own was irrelevant, citing *Citizens*. (*California Licensed Foresters*, *supra*, 30 Cal.App.4th at p. 570.) But it was only irrelevant because the CLFA was deemed to have the same financial stake in the litigation as its membership, not because the CLFA was either rich or poor. (*Id.* at pp. 567, 570.) We therefore believe that the court's citation to *Citizens* in this context was misguided.

17

introduce evidence *on these matters*, so that the trial court may determine whether the financial burden in this case is such that an attorney fee award is appropriate in order to assure the effectuation of an important public policy." (*Id.* at p. 942, italics added.) The clear implication of this language is that consideration of the petitioning party's lack of financial resources is appropriate when conducting a financial burden analysis.

Similarly, in *Mejia v. City of Los Angeles* (2007) 156 Cal.App.4th 151, the appellate court found no abuse of discretion in an award of attorney fees under section 1021.5. In particular, with respect to the financial burden criterion for a fee award, the court opined: "Mejia's personal interest as a homeowner and resident in opposing the proposed development based on an inadequate environmental review was substantial. But her substantial personal interest does not preclude a finding that the financial burden of this litigation was out of proportion to her personal stake in this matter. The financial burden of this litigation on Mejia was great; *she declared that the demands of this litigation caused her to deplete her retirement savings and that she was forced to refinance her home to support this litigation*. We cannot conclude based on the present record that the court's finding that Mejia's personal interest did not outweigh the financial burden of private enforcement was manifestly unreasonable." (*Id.* at p. 159, italics added.) Again, a successful plaintiff's financial hardship was deemed an appropriate consideration under a financial burden analysis. (See also *Gunn v. Employment Dev. Dept.* (1979) 94 Cal.App.3d 658, 666 [noting that the successful plaintiff's pro per status supported an award of fees under section 1021.5 because it would be "an undue financial burden" to place the costs of litigation on her and the fees "should not in the interest of justice be paid out of her comparatively slight recovery of benefits"].)

The City argues that these prior holdings were abrogated by the Supreme Court's subsequent decision in *Whitley*, which articulates a test based solely on a litigant's financial stake in relation to the costs of litigation. We disagree. As discussed above, *Whitley* was focused on whether nonfinancial, nonpecuniary personal interests can disqualify a litigant from a fee award under section 1021.5. (*Whitley*, *supra*, 50 Cal.4th at

18

pp. 1211, 1220–1221.) It did not expressly address the relevance of a litigant's poverty and, indeed, actually quoted with approval the very language from *Woodland Hills* set forth above as an example of a financial burden analysis appropriately limited to a consideration of pecuniary matters. (*Id.* at p. 1223.) Moreover, consideration of a successful litigant's limited financial means makes sense given the underlying purpose of section 1021.5, which, as deduced by *Whitley*, is to solve "the problem of the nonaffordability of litigation that will benefit the public *but cannot pay its own way*." (*Whitley*, *supra*, 50 Cal.4th at p. 1224, italics added.) And, it is consistent with the language of the statute, which requires the court to " 'make the value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved ' " (*id.* at p. 1216; see § 1021.5, subd. (b)) and determine whether "such fees should not in the interest of justice be paid out of the recovery, if any" (§ 1021.5, subd. (c)).

In sum, we believe that the facts mentioned above—including the relative poverty of the Association and its members—are all valid considerations in a section 1021.5 fee analysis and tip the scales decisively in favor of a fee award in these proceedings, especially when considered alongside the more modest estimated monetary value of the case discussed above. On this basis, we conclude that a grant of attorney fees pursuant to section 1021.5 should have been made here, unless the City is correct in arguing that the trial court erred in finding that a number of the other section 1021.5 criteria were satisfied. We therefore turn next to these claims.

    2.    *Other Section 1021.5 Criteria*

With respect to the other section 1021.5 criteria at issue in this appeal, we easily dismiss the City's assertion that the Association was not a prevailing party here because the City also achieved some benefits through the litigation—saving "millions of dollars annually"—while the Association's success was "limited." First, it is well settled that "[p]artially successful plaintiffs may recover attorney fees under Code of Civil Procedure section 1021.5." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2016) 2 Cal.App.5th 1067, 1090.) Indeed, " '[i]n order to effectuate

19

the purpose of section 1021.5, courts "have taken a broad, pragmatic view of what constitutes a 'successful party.' " [Citation.] A "successful" party means a "prevailing" party [citation], and " ' "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on *any* significant issue in litigation which achieves *some* of the benefit the parties sought in bringing suit." ' " ' " (*Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1346.)

Here, when faced with the prospect of substantial pension cuts—both prospective and retroactive—due to alleged errors in the calculation of compensation attached to rank, the Association entered into this litigation with the overarching goal of minimizing those cuts to the extent possible, a goal which it largely achieved. With respect to the holiday pay rate issue, the Association was entirely successful, blocking the City's attempt to decrease the applicable pay rate both retroactively and prospectively. (*OPFRS*, *supra*, 224 Cal.App.4th at pp. 217–221, 227–233.) As for pension benefits related to shift differential pay, the Association did not seriously attempt to stop a prospective reduction in those benefits. However, it was completely successful in halting any attempt by the Board to demand repayments of at least $4,500,000 in past benefits from the affected pensioners, a significant victory. (*Id.* at pp. 221–222, 234–246.) Finally, although the Association was unsuccessful in its attempt to entirely prevent, on equitable grounds, approximately $3,000,000 in repayments based on an error in the number of holidays included in compensation attached to rank, the matter was remanded to the Board so that it could exercise its discretion as to whether to pursue such repayments. (*Id.* at pp. 220–221, 247–249.) Undeniably, the City achieved some benefit from this litigation by confirming that it was not required to fund prospective pension benefits based on shift differential pay. In addition, the litigation confirmed that the number of holidays included in the calculation of PFRS pensions should be tied to the number of holidays granted to similarly situated active employees, giving the City the ability to argue that the Board should demand repayment of the $3,000,000 in back

benefits mentioned above.[8]  In the end, however, as the trial court opined: "[t]he net result is that the [Association] preserved significant recurring annual payments to [affected pensioners], permitted [such pensioners] to retain substantial overpayments, and permitted the [affected pensioners] to argue at the administrative level that [PFRS] should not collect [other] overpayments."  We see no error in the court's conclusion that, based on these outcomes, the Association was a prevailing party, and certainly no abuse of discretion.

Next, the City contends that the Association's litigation efforts failed to enforce important rights affecting the public interest, thus making a fee award under section 1021.5 improper.  In particular, the City argues that the Association, in litigating this matter, was solely concerned with protecting its own economic interests; that the case involved fact-specific contract interpretation rather than broad principles of pension law; and that, even if the published opinion in this matter is of "general legal interest," that fact is insufficient to support a fee award under section 1021.5  In a related vein, the City asserts that the litigation did not significantly benefit the general public or a large group of persons because only the affected pensioners received an economic benefit.  We view the matter somewhat differently than the City, and note in this regard that where, as here, the litigation at issue has resulted in an appellate decision, "an appellate court is in at least as good a position as the trial court to judge whether the legal right enforced through its own opinion vindicates an important public interest and confers a significant benefit on the general public or a broad class of citizens."  (*Bouvia v. County of Los Angeles* (1987) 195 Cal.App.3d 1075, 1083–1084, fn. 7; see also *Police Protective League*, *supra*, 188 Cal.App.3d at pp. 7–9.)

---

[8] While this helped the City retroactively (because the pensioners had been paid for too many holidays), it is sheer speculation to say which party will financially benefit from this holding in the future, as this will depend on whether the number of holidays granted to actives increases or decreases from the status quo in the future.  For example, the MOU language covering the 2012, 2013, and 2014 fiscal years only decreased the number of holidays by one.  (*OPFRS*, *supra*, 224 Cal.App.4th at p. 221.)

21

When determining whether a litigant has vindicated an important right affecting the public interest, "[t]he 'judiciary [must] exercise judgment in attempting to ascertain the "strength" or "societal importance" of the right involved.' [Citation.] 'The strength or societal importance of a particular right generally is determined by realistically assessing the significance of that right in terms of its relationship to the achievement of fundamental legislative goals.' " (*Indio Police Command Unit Assn. v. City of Indio* (2014) 230 Cal.App.4th 521, 541–542.) As for the significant benefit to a large group that will justify an attorney fee award under section 1021.5, we recently confirmed that such a benefit " 'need not represent a "tangible" asset or a "concrete" gain but, in some cases, may be recognized simply from the effectuation of a fundamental constitutional or statutory policy.' [Citation.] In adjudicating a motion for attorney fees under section 1021.5, a trial court should 'determine the significance of the benefit, as well as the size of the class receiving benefit, from a realistic assessment, in light of all the pertinent circumstances, of the gains which have resulted in a particular case.' " (*People v. Investco Management & Development LLC* (2018) 22 Cal.App.5th 443, 465.)

Here, the City correctly argues that the mere fact that this litigation resulted in a published appellate opinion does not necessarily mean that it involves important rights affecting the public interest. However, while "the fact of publication does not reach the level of a 'prima facie showing' the right was important . . . , it goes some distance in that direction." (*Police Protective League*, *supra*, 188 Cal.App.3d at p. 12; see *Adoption of Joshua S.* (2008) 42 Cal.4th 945, 958.) Based on our knowledge of this case, we conclude that our *OPFRS* opinion does, in fact, address matters of public importance sufficient to support a section 1021.5 fee award.

The societal importance of public employee pension rights has long been recognized. In the seminal case of *Kern v. City of Long Beach* (1947) 29 Cal.2d 848, our high court acknowledged a public employee's vested right to his or her pension, opining that when services are provided under a pension statute, the pension provisions "are in effect pay withheld to induce long-continued and faithful services." (*Id.* at p. 852.) Maintenance of a consistent, high quality public workforce has obvious societal benefits.

(See *id.* at p. 856 [stating that "one of the primary objectives in providing pensions for government employees . . . is to induce competent persons to enter and remain in public employment"]; see also *Packer v. Bd. of Retirement* (1950) 35 Cal.2d 212, 215 [same].) Moreover, the need to protect public pension monies from misappropriation has been deemed significant enough to be addressed at the state constitutional level. (See generally Cal. Const., art. XVI, § 17.) And recently, when considering issues of estoppel in the public pension context, we have twice had occasion to reaffirm " 'the "unique importance" of pension right to the well-being of the holders of those rights.' " (*Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2018) 19 Cal.App.5th 61, 127; *OPFRS*, *supra*, 224 Cal.App.4th at p. 242; see also *Petrillo v. BART Dist.* (1988) 197 Cal.App.3d 798, 808–809 [interest in disability retirement benefits "substantial" as the loss of such benefits "could have severe effects upon the worker and his family"].) In a related vein, courts have routinely held that litigation enforcing police officers' employment rights involves "important rights affecting the public interest" for purposes of section 1021.5. (See, e.g., *People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach* (1984) 36 Cal.3d 591, 594–595, 602 [police officers' union litigation to enforce statutory meet and confer obligations met all the requirements for an award under section 1021.5]; *Baggett v. Gates* (1982) 32 Cal.3d 128, 131, 142–143 [enforcement of procedural protections contained in the Public Safety Officers Procedural Bill of Rights Act justifies section 1021.5 fees]; *Robinson*, *supra*, 202 Cal.App.4th at pp. 387, 393–395 [same].) Thus, in successfully litigating to protect both procedural and substantive public pension rights on these facts, the Association was vindicating important rights affecting the public interest.

As for the question of significant benefit to a large group of citizens, the Association's actions protected the pensions of the 590 living pensioners and their families, a clear economic benefit. This, alone might be sufficient to support a fee award under section 1021.5. (See, e.g., *Monterey/Santa Cruz etc. Trades Council v. Cypress Marina Heights LP* (2011) 191 Cal.App.4th 1500, 1523 [900 construction workers "is a 'large class of persons,' and the fact that many of these workers would not be union

23

members further demonstrated that this action conferred benefits which transcended plaintiffs' stake in the matter"].)  However, the *OPFRS* opinion goes beyond the specific contractual dispute defined by the four corners of the Charter, providing less tangible benefits to a much larger groups, including the firefighters also covered by PFRS, other members of fluctuating pension systems throughout the state, and California public pensioners generally.  For instance, the *OPFRS* opinion clarifies the powers and duties of the Board under both the Charter and the state constitution, matters of clear benefit to all PFRS members.  (See *OPFRS*, *supra*, 224 Cal.App.4th at pp. 234–239, 244–246, 249.)  In addition, the opinion's rejection of the trial court's broad reading of *Kreeft*, *supra*, 68 Cal.App.4th 46, provides a benefit not only to PFRS members, but also potentially to members of other fluctuating benefit systems.  (See *OPFRS*, *supra*, 224 Cal.App.4th at pp. 232–233.)  Finally, California public pensioners generally can benefit from the opinion's discussion of res judicata in the context of successive labor agreements and application of equitable estoppel based on statements made by public officials.  (*Id.* at pp. 227–231, 239–246.)  In short, our own independent review of this matter confirms that the Association, through its litigation efforts, enforced public rights affecting the public interest and conferred a significant benefit on the general public and/or a large group of citizens.

Having concluded that the Association has satisfied all of the statutory criteria under section 1021.5, we deem it entitled to an attorney fee award pursuant to that statute. Under such circumstances, "all that remains for this court to do is remand this case to the trial court so that it may exercise its sound discretion in setting an amount of fees." (*Otto v. Los Angeles Unified School Dist.* (2003) 106 Cal.App.4th 328, 335.)  In this regard, a grant of attorney fees to the Association for its efforts in pursuing a section 1021.5 fee award in the trial court and at the appellate level is proper. (*Ibid*.; see also *Police Protective League*, *supra*, 188 Cal.App.3d at p. 17.)

## III. DISPOSITION

The order denying attorney fees to the Association under section 1021.5 is reversed, and the cause remanded to the trial court to make an award of attorney fees and costs consistent with the views set forth in this opinion. Appellants are entitled to their costs on appeal.

_____
REARDON, J.*

We concur:


_____
STREETER, ACTING P.J.


_____
TUCHER, J.

_____

* Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A144653, *City of Oakland v. Oakland Police & Fire Retirement System*

Trial Court:                              Alameda County Superior Court

Trial Judge:                             Hon. Frank Roesch

Counsel for Plaintiff and Respondent:    Nossaman LLP
                                         Stephen N. Roberts
                                         James H. Vorhis
                                         Jill N. Jaffe


Counsel for Defendant:                   Olson Hagel & Fishburn
                                         Richard C. Miadich


Counsel for Interveners and Appellant:   McCracken, Stemerman & Holsberry LLP
                                         W. David Holsberry
                                         Paul More
                                         Sarah Grossman-Swenson