Filed 5/20/24

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| TERESA DOSKOCZ et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>ALS LIEN SERVICES et al.,<br><br>    Defendants and Appellants. | A166299<br><br>(Contra Costa County<br>Super. Ct. No. MSC17–01486) |

Plaintiff Teresa Doskocz originally filed a class action in federal court against defendant ALS Lien Services (ALS) alleging violations of the Fair Debt Collection Practices Act (15 U.S.C. § 1692 et seq.; FDCPA) and California's unfair competition law (Bus. & Prof. Code § 17200 et seq.; UCL) related to ALS's collection of unpaid assessments on behalf of homeowner associations (HOAs).

After the parties stipulated that the federal case would be dismissed and refiled in state court, Doskocz was granted leave to amend her complaint to add allegations that law firm SwedelsonGottlieb and individuals Sandra Gottlieb and David Swedelson (collectively, SG defendants) were alter egos of ALS. The state court also granted Doskocz's motion to bifurcate trial and proceed first on her equitable UCL cause of action. At the conclusion of the

---

\* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II.C., D., E., and F. of the Discussion.

bench trial, the court found that ALS had violated the FDCPA and entered judgment in favor of Doskocz on her UCL cause of action. It also found the SG defendants jointly and severally liable for restitution and class counsel fees as alter egos of ALS.

ALS now seeks reversal of the judgment by arguing that the trial court (1) erred in adopting a ruling by the federal judge in the original action, (2) erred in ruling that ALS violated the FDCPA, and (3) abused its discretion in granting Doskocz's motion to bifurcate. The SG defendants also challenge the judgment, arguing that the trial court (1) lacked substantial evidence on its alter ego findings, (2) abused its discretion in granting Doskocz leave to amend her complaint, and (3) abused its discretion in awarding attorney fees to class counsel.

We disagree and affirm.

## I. BACKGROUND

### A. *ALS Collection from Doskocz*

Doskocz owns a townhouse in Danville, California that is part of Danville Green Homeowners Association, Inc. (Danville Green). Danville Green hired ALS to collect unpaid HOA assessments from Doskocz. At the time of trial, ALS was working with approximately 100 HOAs throughout the state.

ALS uses the nonjudicial foreclosure process to collect assessments and other charges. In November 2013, ALS sent Doskocz its standardized "pre-lien letter," which stated that Doskocz was delinquent in the payment of assessments and owed Danville Green $1,239.08. It also stated that Doskocz could request a payment plan for the debt. The next month, ALS recorded a delinquent assessment lien against Doskocz's townhouse.

2

Doskocz agreed to a payment plan. The plan included a waiver of Civil Code section 5655, subdivision (a) (section 5655(a)),[1] which requires payments "first be applied to the assessments owed, and, only after the assessments owed are paid in full shall the payments be applied to the fees and costs of collection, attorney's fees, late charges, or interest." ALS's standard payment plan includes this waiver, and its standard collection contract terms require HOAs to agree to payment plans with this waiver. During Doskocz's payment plan period, ALS applied only a portion of her payment towards unpaid assessments, applying the rest to ALS's collection fees and costs.

Doskocz made five of the six payments in the plan, but was unable to make the final payment. Doskocz requested a second payment plan. ALS responded that her total balance was $1,074.90, but proposed a plan for three monthly payments totaling $2,033.19. Instead of accepting this proposal, Doskocz sent in two monthly payments of $537.45, intended to satisfy the total balance.

The next month, in October 2014, ALS sent Doskocz its standardized pre-notice of default letter (pre-NOD letter). The letter stated that Doskocz owed $830.73, and that if payment was not received, ALS "will record a Notice of Default." ALS eventually closed the collection account and billed Danville Green for $425 in collection fees and costs, which Danville Green paid.

---

[1] Section 5655(a) is a provision of the Davis-Stirling Common Interest Development Act (Civ. Code, § 4000 et seq.; Davis-Stirling Act). The Davis-Stirling Act "set[s] forth comprehensive rules, restrictions, and procedures for imposing, paying, collecting, and enforcing regular and special [homeowner] assessments." (*Huntingon Continental Townhouse Assn., Inc. v. Miner* (2014) 230 Cal.App.4th 590, 599.)

3

### B. Filing in Federal Court

Doskocz filed a class action in federal court against ALS in 2015, alleging its collection practices violate the FDCPA and thus constitute unlawful business practices under the UCL. ALS moved for summary judgment on various grounds, including that it had complied with the FDCPA because Doskocz waived section 5655(a). The federal court rejected that argument, concluding the waiver was void as a matter of public policy. Several months after that ruling, the parties stipulated that the federal case would be dismissed and refiled in state court, but subject to the federal judge's summary judgment ruling.

### C. Refiling in State Court

Doskocz filed her state court complaint in 2017, and the court granted her motion for class certification in 2018. Then, in 2020, the court granted Doskocz's request for leave to file a first amended complaint to add alter ego allegations against the SG defendants. ALS moved for summary judgment shortly thereafter, renewing its argument that Doskocz had waived section 5655(a). The court declined to reconsider the federal judge's ruling and denied the motion.

### D. Bench Trial

In 2022, the court granted Doskocz's motion to bifurcate and proceed first by bench trial on her equitable UCL cause of action. At trial, Doskocz presented two underlying violations of the FDCPA to support her UCL cause of action: (1) ALS's application of homeowner payments contrary to section 5655(a); and (2) ALS's pre-lien and pre-NOD letters as improper threats of foreclosure contrary to Civil Code[2] section 5720, which limits

---

[2] Further undesignated statutory references are to the Civil Code.

4

collection of delinquent assessments through foreclosure until the amount owed is at least $1,800 or more than 12 months delinquent.

### E. Judgment

In its statement of decision, the court concluded that ALS had violated the FDCPA in both respects and found the SG defendants were alter egos of ALS. After the court entered its statement of decision, Doskocz elected not to proceed with the scheduled jury trial on her FDCPA cause of action and that cause of action was dismissed.

Judgment was entered in favor of Doskocz on her UCL cause of action. ALS and the SG defendants were jointly and severally liable for $156,753 in restitution to the class (calculated as fees and costs charged by ALS after homeowner account balances would have been zero if their payments had been applied to unpaid assessments instead of other charges). The judgment also included injunctive relief against ALS related to application of homeowner payments, recalculation of class member accounts, communication with homeowners, and charging of late fees and interest.

ALS and the SG defendants each filed timely notices of appeal.

## II.  DISCUSSION

ALS raises three issues on appeal. First, it argues that the trial court erred in adopting the federal judge's ruling that the section 5655(a) waiver was void as a matter of public policy. Second, it argues that the court erred in ruling that ALS violated the FDCPA through its pre-lien and pre-NOD letters. Third, ALS argues that the court abused its discretion in granting Doskocz's motion to bifurcate and proceed first with a bench trial on her UCL cause of action.

The SG defendants also raise three issues on appeal. First, they argue that the trial court lacked substantial evidence on its alter ego findings.

5

Second, they argue that the court abused its discretion in granting Doskocz leave to amend her state court complaint. Third, the SG defendants argue that the court abused its discretion in awarding attorney fees to class counsel.

We address, and reject, each argument in turn.

## A. *No Error on Section 5655 Waiver Rulings*

### 1. Additional Background

When ALS moved for summary judgment in the federal action, it argued that it had complied with the FDCPA because Doskocz had waived her rights under section 5655(a) to prioritize application of her payments to unpaid assessments first, before ALS's collection fees and costs. Doskocz opposed the motion, arguing that the waiver was void as a matter of public policy under section 3513.[3]

The federal court recognized that "[t]he California Supreme Court does not appear to have addressed this issue, and neither party has identified a case directly on point." Citing *DeBerard Properties, Ltd. v. Lim* (1999) 20 Cal.4th 659, it explained that section 3513 bars the waiver of a statutory right when the " ' "public benefit [of the statute] is one of the primary purposes." ' " (*DeBerard*, at p. 669.)

The federal court determined that the "public purpose and benefit inherent in the Davis-Stirling Act and section 5655(a)" had been established, and there "can be no serious doubt that the Legislature adopted the Act for the primary purpose of protecting homeowner rights—a quintessential public benefit." It pointed to legislative history material that the provision now

---

[3] Section 3513 provides: "Any one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement."

found in section 5655(a) " 'goes to the heart of home owner rights, touching upon the key issue of when, if ever, a homeowners' association should have the right to force the sale of a member's home when the home owner falls behind on paying overdue assessments or dues.' "

The federal court thus concluded that section 5655(a) "serves the important public purpose of protecting homeowner equity and rights by ensuring that a delinquent assessment, which is the original debt that opens the door to collection costs and ultimately foreclosure, is paid down as a first priority. This allocation clearly serves the legislative goal of preventing foreclosure over small delinquencies, and operates to cut off a cascade of late fees and collection costs likely to lead to defaults and foreclosures. To allow a waiver of this provision by contract would flout the very purpose of the section and the Davis-Stirling Act generally, and so the contract clause must be voided as against public policy." The parties' subsequent stipulation for dismissal of the federal case and refiling in state court provided that the "new state court action will be subject to this Court's Order Re Summary Judgment."

When ALS moved for summary judgment in the state court action, it renewed its argument that Doskocz's claims failed as a matter of law because she had waived section 5655(a). The state court rejected this argument and denied the motion. It explained: "ALS'[s] motion for summary judgment is either a motion for reconsideration or a motion for summary judgment on an issue already decided against the moving party. . . . ALS has made no showing of new facts or law and it appears that the majority of ALS'[s] waiver argument is identical to the argument it made in federal court." The state court declined to reconsider ALS's waiver argument. It found that the

federal court ruling "stands and thus, the waiver of Civil Code section 5655(a) is invalid."

### 2. Analysis

ALS appears to challenge the section 5655(a) waiver ruling in two respects, arguing that (1) the federal judge was "wrong" in finding the waiver void as a matter of public policy, and (2) the state court erred in "adopting" the federal court's ruling.

As for the federal judge's interpretation of section 5655, our review is de novo. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527.) " ' "The fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' " (*Pacific Fertility Cases* (2022) 78 Cal.App.5th 568, 575.) " '[W]e first examine the words themselves, giving them their usual and ordinary meaning and construing them in context.' " (*Id.* at p. 576.) " 'If the words in the statute do not, by themselves, provide a reliable indicator of legislative intent,' " we look " ' " 'to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " ' " (*Ibid.*) If the meaning is still unclear, we follow the " ' "*more* reasonable result." ' " (*Ibid.*, italics added by *Pacific Fertility Cases*.)

Section 3513 bars waiver of a statutory right when the " 'public benefit' " of a statute is " 'one of its primary purposes.' " (*Azteca Construction, Inc. v. ADR Consulting, Inc.* (2004) 121 Cal.App.4th 1156, 1166.) Such prohibitions on waiver can be express or implied. (Compare § 1751 ["Any waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void."] with *Armendariz v. Foundation Health*

*Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 100 [concluding waiver of rights under Fair Employment and Housing Act contrary to public policy based on broad goal of statutory scheme to protect employees from discrimination and harassment].)

ALS contends that section 5655 cannot be interpreted to contain an implied prohibition on waiver because it was adopted for a "narrow, very private interest." We disagree. In 1996, the concept of prioritizing application of payments to unpaid assessments was codified in section 1367, requiring that "any payments toward such a debt shall first be applied to the principal owed, and only after the principal owed is paid in full shall such payments be applied to interest or collection expenses." (Stats. 1996, ch. 1101, § 4, capitalization omitted.) In 2002, section 1367.1 was added to the statutory scheme to clarify and expand pre-lien notice requirements. (Stats. 2002, ch. 1111, § 8.) Section 1367.1, subdivision (b) included a similar sentence with broader language regarding the priority of applying payments to assessments owed before "fees and costs of collection, attorney's fees, late charges, or interest." Ten years later, sections 1367 and 1367.1 were repealed and that sentence from section 1367.1, subdivision (b) was recodified in section 5655(a). (Stats. 2012, ch. 180, § 2.) In every formulation, the requirement has been *mandatory*—it affords no discretion to HOAs to decline prioritization. (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1143 [recognizing "presumption that the word 'shall' in a statute is ordinarily deemed mandatory"].)

But as the purpose of the requirement is not evident from the statutory text alone, we find the legislative history from both sections 1367 and 1367.1

9

instructive.[4] The materials from section 1367 show that the Legislature viewed this prioritization requirement as an important public benefit. Under existing law, HOAs had the power to impose interest, charges, and costs related to the collection of unpaid assessments, all of which created a lien enforceable by nonjudicial foreclosure. (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Assem. Bill No. 1317 (1995–1996 Reg. Sess.) as amended Sept. 6, 1995, p. 3.) The author of the bill explained that the current law "invites overreaching by collection firms," applying payments to collection costs rather than the principal balance and creating a "treadmill wherein the collection costs continue to accrue despite the good faith efforts of the homeowner to cure any back debts." (Assem. Mem. Jackie Speier author of Assem. Bill No. 1317 (1995–1996 Reg. Sess.), letter to Gov. Wilson, Sept. 10, 1996, pp. 2–3.)

The prioritization requirement was thus intended to protect homeowners from abuses by collection firms and "insensitive and overzealous associations who adopt unnecessarily adversarial tactics in collecting past due assessments." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1317 (1995–1996 Reg. Sess.) as amended Aug. 21, 1995, p. 7.) Concern about these abuses outweighed arguments in opposition that the statute would interfere with private agreements between homeowners and HOAs. (Sen. Housing & Land Use Com., com. on Assem. Bill No. 1317 (1995–1996 Reg. Sess.) as amended June 13, 1995, p. 3.) These materials also make clear that the

---

[4] We grant Doskocz's unopposed request to take judicial notice of three legislative analyses of the bill enacting section 1367.1 that were presented to the federal court on summary judgment. We deny Doskocz's opposed supplemental request to take judicial notice of the timing of text included in that bill as not necessary or helpful to our analysis. (Cal. Rules of Court, rule 8.252; *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6.)

Legislature considered these protections applicable to a significant percentage of its populace: at the time, approximately five million homeowners lived in the state's 30,000 common interest developments. (Assem. Mem. Jackie Speier author of Assem. Bill No. 1317 (1995–1996 Reg. Sess.), letter to Gov. Wilson, *supra*, at p. 1; Assem. Mem. Dan Hauser, letter to Gov. Wilson, Sept. 10, 1996.)

The legislative history from section 1367.1 is consistent with this purpose, explaining that the statute was "primarily designed" to address the same concerns regarding the nonjudicial foreclosure process for delinquent payments. (Sen. Com. on Judiciary, Analysis of Bill No. 2289 (2001–2002 Reg. Sess.) as amended June 19, 2002, p. 5; see also *Diamond v. Superior Court* (2013) 217 Cal.App.4th 1172, 1190 [finding intent regarding public purpose of section 1367.1 in legislative history].) Contrary to ALS's suggestion, the lack of explicit references to the prioritization requirement in these materials does not suggest some other private or narrow purpose. Nor is it particularly surprising, given that the requirement was similar to the one already in section 1367.

ALS's remaining arguments do not alter our view. First, ALS suggests that section 5665 limits a homeowner's rights under 5655. Section 5665 requires an HOA to provide any "standards" it has for payment plans to an owner requesting such a plan. (*Id.*, subd. (a).) This provision was originally added as part of section 1367.1, subdivision (c)(2). (Stats. 2002, ch. 1111, § 8.) Given the prioritization requirement in section 1367.1, subdivision (b), we adopt a construction that " ' "best serves to harmonize the statute internally." ' " (*Pacific Fertility Cases*, *supra*, 78 Cal.App.5th at p. 576.) We thus interpret section 5665 to contemplate optional HOA standards for

11

payment plans, but *not* to allow standards that contravene the prioritization requirement in the preceding section 5655(a).

Second, ALS argues that section 5655 does not confer a public benefit because without waiver of the prioritization requirement, there is "evidence" that HOAs are less likely to agree to payment plans. ALS does not offer or explain this "evidence." We find the argument dubious, as HOAs would still be incentivized to enter into payment plans to recover the principal balance of assessments owed, resolve collection accounts as quickly as possible, and avoid foreclosure processes.

Finally, at oral argument on appeal, counsel for ALS argued the company acted merely as an agent of the HOA and therefore is not, itself, subject to the provisions of the Davis-Stirling Act; rather, only the HOA is, and therefore any liability under the Act lies only against the HOA. While ALS's appellate briefing made passing reference to its agency status, ALS never made any argument in its briefing that, as an agent of the HOA, the provisions of the Act did not apply to its actions, let alone provide authority supporting such an argument. It therefore forfeited the argument. (Cal. Rules of Court, rule 8.204(a)(1)(B) [requiring briefs to state each point under a separate heading or subheading summarizing the point and to provide argument and, if possible, supporting authority]; *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 ["Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, we consider the issues waived."].)

In sum, we conclude the federal court did not err in ruling that the waiver was void as against public policy.[5]

_____

[5] Given our de novo review of this issue and the parties' stipulation that the state action was "subject to" the federal court's ruling, we need not

12

### B. *No Error on FDCPA Rulings*

#### 1. Additional Background

When ALS moved for summary judgment in this state court action, it argued that Doskocz's claims failed as a matter of law because ALS's pre-lien letter did not improperly threaten foreclosure. The court rejected the argument. It first quoted a boldface, capitalized statement in the letter: "IMPORTANT NOTICE: IF YOUR SEPARATE INTEREST IS PLACED IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR ASSESSMENTS, IT MAY BE SOLD WITHOUT COURT ACTION." (Boldface omitted.) The court then referenced the next portion of the letter, which stated: "If the foreclosure process begins, you are legally obligated to pay all fees and costs associated with that process. Should you fail to pay all delinquent assessments, late charges, costs of collection, including all lien and foreclosure process costs and fees, attorneys' fees and interest, you may lose your property." The court concluded that this letter, reviewed under the least sophisticated consumer standard, threatened foreclosure and thus violated the FDCPA.

In its statement of decision after trial, the court reached the same conclusion about not only the pre-lien letter but also the pre-NOD letter. On the pre-lien letter, the court explained that the boldface, capitalized language was required by law.[6] The language below that statement, however, was not required by law and "[t]he least sophisticated debtor would reasonably understand the unbolded language as threatening a foreclosure sale." On the

address ALS's procedural argument that the state court erred in "adopting" the ruling and declining to reconsider it.

[6] Section 5660, subdivision (a) requires that the boldface, capitalized statement set forth above be included in the notice sent to an owner prior to recording a lien to collect a debt from delinquent assessments.

pre-NOD letter, the court quoted the following statement:  "If payment is not received within ten (10) days, then Association Lien Services will record a Notice of Default.  Copies of the Notice of Default will be provided to your mortgage company and to anyone else having a legal interest in your property and entitled to notice under the Civil Code.  Please note that if Association Lien Services is required to record the Notice of Default, you will also be responsible for paying an additional fee of approximately $995.00 for preparing and serving the Notice of Default, acquiring a Trustee's Sale Guarantee along with any applicable recording, mail and related costs."

The court explained that recording a notice of default is "a necessary step in perfecting the right to hold a foreclosure sale" and that section 5720's prohibition on collection through foreclosure of delinquent assessments that are less than $1,800 or more than 12 months old "means not only a foreclosure sale but also the commencement and perfection of the foreclosure process leading up to a sale, including recording a Notice of Default."  The court then concluded that the "least sophisticated debtor would reasonably understand recording a Notice of Default, notifying mortgage lenders, and obtaining a Trustee's Sale Guarantee as indicating an intention to conduct a foreclosure sale."

### 2. Analysis

The FDCPA prohibits a debt collector from engaging in certain practices to collect or attempt to collect a debt, including threatening to take action that cannot be legally taken and threatening to effect dispossession of property where there is no present right to possession of the property. (15 U.S.C. §§ 1692e(5), 1692f(6)(A).)  "[A] threat need not be express:  it can be implied." (*Gonzalez v. Arrow Financial Services, LLC* (9th Cir. 2011) 660 F.3d 1055, 1064.)  To determine whether conduct violates the FDCPA,

14

courts employ the " 'least sophisticated debtor' " standard. (*Gonzalez*, at p. 1061, fn. 2 [discussing adoption by Ninth Circuit and majority of other courts].) This standard " 'preserv[es] a quotient of reasonableness and presum[es] a basic level of understanding and willingness to read with care,' " but is " 'designed to protect consumers of below average sophistication or intelligence,' or those who are 'uninformed or naive,' particularly when those individuals are targeted by debt collectors." (*Id*. at p. 1062.)

Here, Doskocz claimed that ALS's pre-lien and pre-NOD letters violated these provisions of the FDCPA because the letters threatened foreclosure when foreclosure was not permitted under section 5720. Section 5720, subdivision (b) provides that an HOA "may not collect" a delinquent assessment less than $1,800 or more than 12 months old "through judicial or nonjudicial foreclosure," but may "attempt to collect or secure that debt" through a civil action in small claims court, recording a lien that the HOA may not foreclose upon until the delinquent assessment reaches $1,800 or more than 12 months, or "[a]ny other manner provided by law, except for judicial or nonjudicial foreclosure." When ALS sent its pre-lien and pre-NOD letters, Doskocz's delinquent assessment had not met this $1,800 or 12-month threshold.

We have some doubt as to whether ALS's pre-lien letter can reasonably be characterized as threatening foreclosure before the delinquent assessment reached this statutory threshold. Nor do we need to make this determination. As counsel for Doskocz acknowledged at oral argument, if we conclude ALS's pre-NOD letter can properly be so characterized, that suffices

15

to uphold the judgment.[7]  Our review is de novo.  (*Gonzalez v. Arrow Financial Services, LLC*, *supra*, 660 F.3d at p. 1060.)

ALS argues that the least sophisticated debtor would not read the pre-NOD letter as a threat of foreclosure because it only tells the homeowner that a notice of default will be recorded if payment is not received.  ALS contends that this does not violate section 5720 because the term "foreclosure" in that provision means only a foreclosure *sale*, not steps in the foreclosure process (e.g., recording a notice of default) leading up to the sale.

Such a constrained reading of section 5720 is not supported by its plain language or legislative history.  Section 5720, subdivision (b) imposes constraints on an HOA that "seeks to collect" or "attempt[s] to collect or secure [a] debt" below the $1,800 or 12-month threshold.  Recording a notice of default starts the foreclosure process:  it is the initial step, followed by a notice of sale and then sale.  (§ 2924, subd. (a)(1).)  The phrasing "seeks to collect" or "attempt[s] to collect" suggests an intent to cover these steps to commence and perfect the foreclosure process, not just the final step of a completed sale.

The legislative history of section 5720 supports this interpretation.  The provision was originally added to the statutory scheme in section 1367.4, subdivision (b) and then reorganized and recodified as section 5720, subdivision (b). (Stats. 2005, ch. 452, § 4; Stats. 2012, ch. 180, § 2.)  The Legislative Counsel's Digest stated that section 1367.4 "would revise and

---

[7] The judgment enjoins ALS from (1) engaging in communications "indicating that any step in the non-judicial foreclosure process may be initiated or pursued, including that a Notice of Default may be recorded" and (2) recording any notice of default before the $1,800 or more than 12 months old threshold is met.  ALS is also required to rescind notices of default or trustee's sale where the threshold had not been met.

recast the procedures for collecting delinquent assessments for certain debts." (Legis. Counsel's Dig., Sen. Bill No. 137 (Stats. 2005 (2005–2006 Reg. Sess.) Summary Dig.)  Interpreting the term "foreclosure" from section 5720 to include the procedural step for initiating foreclosure is consistent with this legislative goal.  We thus agree with the trial court that the least sophisticated debtor would reasonably understand this language in ALS's pre-NOD letter as threatening foreclosure in violation of section 5720.

In sum, we conclude that the trial court did not err in determining that ALS's pre-NOD letter violated the FDCPA.

## C. *No Abuse of Discretion on Motion to Bifurcate*

### 1. Additional Background

Doskocz moved to bifurcate trial and proceed first on her equitable UCL cause of action.  ALS opposed the motion on the ground that the UCL cause of action (for unlawful business practices) was predicated on violations of the FDCPA.  ALS argued that it was entitled to a jury trial to determine its liability under the FDCPA, including whether the waiver of homeowner rights under section 5655(a) was a "bona fide error" under the FDCPA.[8]

The court granted the motion.  In so doing, it explicitly declined to rule on the parties' dispute regarding what issues under the FDCPA cause of action required a jury trial.  The trial court stated it need not decide that now because even "assuming these are issues for the jury the Court would still decide to hear the UCL claim first."  In its statement of decision after trial, the court concluded that the bona fide error defense did not apply to

---

[8] Title 15 United States Code section 1692k(c) provides:  "A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."

17

Doskocz's UCL cause of action and even if it did, "ALS did not act unintentionally, based on a bona fide error, and maintain procedures reasonably adapted to avoid the violation in using waivers of § 5655(a) in payment plans."

### 2. Analysis

We review a trial court's decision to bifurcate for abuse of discretion. (*Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 163.) While courts retain broad discretion on the sequencing of trial, this discretion is not unlimited. (*Ibid.*) " 'The scope of discretion always resides in the particular law being applied' . . . . 'Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' " (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393.) ALS bears the burden to show the trial court abused its discretion here. (*Property California SCJLW One Corp. v. Leamy* (2018) 25 Cal.App.5th 1155, 1163.)

To satisfy this burden, ALS repeats its argument that the motion to bifurcate "completely ignored the fact that in order to establish a claim under the UCL, [Doskocz] would need to establish a violation of the FDCPA as the predicate statute for finding a violation of the UCL" and that ALS was entitled to a jury trial on the issue of liability under the FDCPA. ALS contends that the trial court's ruling is "inherently contradictory" because it acknowledged that issues of liability under the FDCPA would be encompassed in the UCL cause of action but "*assumed*, rightly or wrongly," that ALS had some right to a jury trial on the FDCPA cause of action.

We begin with the principle that the right to a jury trial in civil cases is generally limited to legal causes of action, not equitable ones. (*Hoopes v. Dolan*, *supra*, 168 Cal.App.4th at p. 155.) "Over the more than 80-year

18

history of the UCL, scores of decisions of both this court and the Courts of Appeal have uniformly recognized that the cause of action established by this statute is equitable in nature." (*Nationwide Biweekly Administration, Inc. v. Superior Court* (2020) 9 Cal.5th 279, 301.) The California Supreme Court has made clear that "there is no right to a jury trial in a cause of action under the UCL." (*Id.* at p. 327.) Courts have declined to depart from this rule where a defendant raises the argument ALS makes here: that the predicate law for establishing a UCL cause of action for unlawful business practices entitles it to a jury trial.

In *Hodge v. Superior Court* (2006) 145 Cal.App.4th 278 (*Hodge*), for example, employees asserted a UCL cause of action premised on violations of the Labor Code regarding overtime wages. (*Hodge*, at p. 282.) The employer contended it was entitled to a jury trial because the cause of action was predicated on a legal question regarding a breach of contract and its affirmative defense required adjudication of legal claims. (*Id.* at pp. 283–284.) *Hodge* reasoned that "[a]lthough the unlawful prong of the UCL borrows from other laws, it is not a substitute for those laws." (*Hodge*, at p. 284.) The UCL makes this explicit: "Unless otherwise expressly provided, the remedies or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state." (Bus. & Prof. Code, § 17205.)

Moreover, " 'the overarching legislative concern' " in enacting the UCL was " 'to provide a *streamlined* procedure for the prevention of ongoing or threatened acts of unfair competition' " and "[c]onsistent with this objective, the UCL provides only for equitable remedies. . . . Damages are not available." (*Hodge*, *supra*, 145 Cal.App.4th at p. 284.) Accordingly, the UCL "is not simply a legislative conversion of a legal right into an equitable one"

19

but a different and separate equitable cause of action. (*Hodge*, at p. 284.) *Hodge* thus concluded that the presence of legal issues did not "transform" the employees' equitable UCL cause of action into one of law. (*Hodge*, at p. 285.)

The same reasoning applies here: the fact that the UCL cause of action required determination of ALS's liability under the FDCPA did not transform Doskocz's equitable UCL cause of action into a legal one.[9] Indeed, "[s]uits under [the UCL] are often combined with causes of action that entitle the plaintiff to a jury trial (e.g., fraud, breach of contract)" and issues decided first "in a UCL bench trial (which may include determination of predicate claims such as fraud, etc.) may make a jury trial unnecessary." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2023) ¶ 14:230.1, citing *Rincon EV Realty LLC v. CP III Rincon Towers, Inc.* (2019) 43 Cal.App.5th 988, 995, 1005 [court addressed six legal claims in ruling on equitable UCL cause of action].) We thus conclude that ALS has not met its burden to show the trial court abused its discretion in granting Doskocz's motion to bifurcate.

## D. Substantial Evidence on Alter Ego Findings

### 1. Additional Background

In its statement of decision after trial, the court concluded that the SG defendants were alter egos of ALS. Quoting *Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 837 (*Associated Vendors*), the court described the two-part test for applying the alter ego doctrine: " '(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and

---

[9] Given this conclusion, we need not address the parties' arguments on the merits of any bona fide error defense.

(2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.' "

On the first part of the test, the trial court found there was such a unity of interest and ownership. Swedelson and Gottlieb are husband and wife, and have always been the sole shareholders and directors of ALS. Gottlieb is the chief executive officer and president of ALS. Swedelson and Gottlieb started their assessment collection business, Association Lien Services, in 1987. Swedelson and Gottlieb are also the sole general partners of their law firm, which is a general partnership between them. The law firm was formed in 1987, the same year as Association Lien Services.

From 1987 to 2005, Swedelson and Gottlieb operated both businesses as a single entity. In 2005, Swedelson and Gottlieb incorporated Association Lien Services (as "ALS Lien Services" because the original name was not available) based on personal tax advantages. Upon incorporation, the law firm entered into a sublease with ALS to continue to operate out of the suite immediately adjacent to the law firm office, as well as a management agreement to continue the shared administrative services, access, and use of facilities from the law firm that ALS had before.

ALS and the law firm shared common personnel, and law firm employees routinely provided services (like letter reviews) to ALS. As of December 2013, ALS was in default on payments under the sublease and management agreement. Gottlieb agreed to forego her ALS salary, and the law firm, in violation of ALS's rights under the sublease, subleased portions of ALS's space to other subtenants. The court found Swedelson and Gottlieb had used ALS to procure legal work for the law firm. ALS's standard collection contract terms provided for use of the law firm's legal services.

21

ALS advertised the law firm's legal services on its website and in other marketing materials.

On the second part of the test, the court found that failure to apply the alter ego doctrine would lead to an inequitable result. When ALS was incorporated in 2005, Swedelson and Gottlieb contributed $28,000 total in capital. They also obtained an insurance policy with a $1 million limit and a $250,000 class action sublimit.

The court found that Swedelson and Gottlieb "failed to provide ALS with sufficient unencumbered capital and/or insurance to cover its reasonably foreseeable liabilities" related to "unfair debt collection litigation." It found they were aware of these risks at the time of incorporation because they had previously defended Association Lien Services in another FDCPA class action in which they had charged $1,076,227.14 for legal fees. ALS educational materials showed Swedelson and Gottlieb were "sophisticated" in their knowledge of FDCPA liability. Between 2012 and 2020, ALS was sued at least 12 times for debt collection activities.

As described above, ALS was in default on payments under the sublease and management agreement by the end of 2013. When ALS was collecting Doskocz's account in 2013 and 2014, it had no significant unencumbered capital. ALS's default on its payments under the sublease and management agreement continued to grow.

ALS had around $100,000 in total income from 2015 to 2021, but had $825,000 in delinquencies. During that period, ALS paid the law firm approximately $1.4 million in rent, management fees, legal services, and compensation to Gottlieb. This included $300,000 in attorney fees billed as outside counsel in this litigation (beyond fees paid to insurance defense counsel after exhaustion of the insurance policy). The court found that this

22

$300,000 in payments had a "significant adverse financial impact on ALS," and that Swedelson understood bankruptcy would stay the litigation and stop "financial drains," but neither Swedelson nor Gottlieb ever considered it. The court also found it was reasonable to infer that Swedelson and Gottlieb "tolerated" ALS's defaults because, given its public identification with the law firm, ALS's bankruptcy or "financial failure" would be damaging to the law firm.

By the time of trial, ALS had been insolvent for several years and was unable to pay a class judgment. ALS's approximate net worth was *negative* $1.1 million. The court found that the SG defendants' (1) failure to "adequately capitalize ALS to respond to reasonably expected unfair debt collection class action litigation," (2) continuation of ALS's business since 2013 without "adequate capital or insurance to respond to a Judgment in this case," and (3) diversion of ALS funds to themselves was "in bad faith and intentional, for the wrongful and intentional purposes of circumventing the requirements of the FDCPA and Davis-Stirling Act and of avoiding ALS's liability to the Class in this case."

The trial court noted that the SG defendants had presented testimony from an "expert on alter ego," including opinions regarding the observance of corporate formalities and the separateness of entities. The trial court concluded, however, that the expert had "testified about his opinion based on incomplete facts provided to him. As a result that opinion was not helpful to the Court. Also the legal conclusion reached by him, even [if] it was on complete facts, invades the discretion of the court under the law."

23

**2. Analysis**

The SG defendants challenge the trial court's findings on both parts of alter ego test. At oral argument on appeal, the SG defendants conceded that the proper standard of review is whether there is "substantial evidence contained in the record to uphold the findings of the trial court." (*Associated Vendors, supra,* 210 Cal.App.2d at p. 835.)

*Associated Vendors* identifies various factors to consider in the alter ego test, including identical equitable ownership, use of the same office and employees, use of a corporation to procure services or serve as an "instrumentality" or a "conduit" for the business of another entity, and failure to maintain an arm's-length relationship. (*Associated Vendors, supra,* 210 Cal.App.2d at pp. 838–840.)

There was ample evidence to support the court's finding on unity of ownership and interest under these factors. Swedelson and Gottlieb were the sole shareholders, officers, and directors of ALS, as well as the sole general partners of SwedelsonGottlieb. ALS used the administrative services and facilities of the law firm office. ALS and the law firm shared common personnel, and law firm employees performed work for ALS. The agreements with HOAs and marketing by ALS show it was used as an instrumentality or a conduit for law firm business. And the law firm's failure to act on ALS's defaults and its improper sublease of the ALS space show they did not maintain an arm's-length relationship.

The SG defendants cite evidence and expert testimony regarding certain corporate formalities to suggest otherwise, including the sublease agreement and separateness of various accounts and policies. But these formalities do not overcome the substantial evidence on the other factors, particularly given that the law firm subsequently *violated* this sublease

24

agreement. (See *Associated Vendors*, *supra*, 210 Cal.App.2d at p. 840 [consideration of presence or absence of various factors "within the province of the trial court" and any conflict is for trier of fact to resolve].) The SG defendants also suggest that Gottlieb's forfeiture of her ALS salary weighed against any unity of ownership or interest, citing *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 529. That case is entirely inapposite, as it analyzed only the *second* part of the alter ego test and concluded that a parent company's advance of funds to a subsidiary does not alone prove injustice. (*Id.* at p. 539.) Even accepting the analogy between an advance and salary forfeiture, *Sonora Diamond* says nothing about how it factors into unity of ownership or interest.

Turning to the second part of the test, the SG defendants contend that the trial court "made no finding of any injustice." In so doing, the SG defendants appear to suggest there was no evidence of actual fraud or fraudulent intent necessary for such a finding. But the alter ego doctrine "does not depend on the presence of actual fraud." (*Associated Vendors*, *supra*, 210 Cal.App.2d at p. 838.) Instead, "it is designed to prevent what would be fraud or injustice, if accomplished. Accordingly, bad faith in one form or another is an underlying consideration and will be found in some form or another in those cases wherein the trial court was justified in disregarding the corporate entity." (*Ibid.*) Here, the trial court concluded that the SG defendants acted intentionally and "in bad faith" by failing to adequately capitalize ALS, continuing ALS's business without adequate capital or insurance, and diverting ALS funds to themselves.

Failure to adequately capitalize, absence of corporate assets, and undercapitalization are all factors that can be considered in applying the alter ego doctrine. (*Associated Vendors*, *supra*, 210 Cal.App.2d at p. 839.)

25

When ALS was incorporated, Swedelson and Gottlieb contributed only $28,000 in capital, and obtained an insurance policy with a $1 million limit and a $250,000 class action sublimit despite having previously defended Association Lien Services in a FDCPA class action and charging over a million dollars for legal services. Swedelson and Gottlieb proceeded with ALS's business despite the risks reasonably foreseeable after this litigation. Over the next several years, they continued ALS's business despite growing delinquencies and additional lawsuits. Then they charged ALS legal fees as outside counsel in this action. The SG defendants argue that those fees should not be considered because they reflect legal services rendered. But that misses the point. Swedelson and Gottlieb never considered options for ALS that would have mitigated or at least suspended these costs (e.g., bankruptcy), instead charging $300,000 in fees above and beyond those paid to insurance defense counsel. The evidence on each of these points supported the court's finding that failure to apply the alter ego doctrine would lead to an inequitable result here.

We conclude that the trial court's alter ego findings were supported by substantial evidence.

### E. No Abuse of Discretion on Leave to Amend Complaint

#### 1. Additional Background

In 2020, the court granted Doskocz's request for leave to file a first amended complaint to add alter ego allegations against the SG defendants. Neither the motion nor the court's ruling are included in the record here. ALS subsequently filed a petition for writ of mandate to vacate the order. This court denied the petition based on failure to demonstrate with reference to facts that ALS would suffer irreparable harm absent review by extraordinary writ.

26

In 2021, the SG defendants filed a demurrer to the first amended complaint, arguing that the claims against them were barred by the stipulation between Doskocz and ALS in the original federal action. The stipulation read, in relevant part: "In the state court complaint, Plaintiff may, consistent with this Stipulation, delete claims from the Complaint in this action, but may not add any new claims. Plaintiff waives any right to amend causes of action in the state court action under California law, except as allowed by the Superior Court in ruling on any Demurrer or other motion filed by Defendant." The SG defendants argued that the first amended complaint improperly alleged "new claims" against them based upon alter ego theories of liability.

While the same argument had been made by ALS in opposition to the motion for leave to amend, the trial court concluded collateral estoppel did not apply because the SG defendants were not parties at that time. Citing *Hennessey's Tavern, Inc. v. American Air Filter Co.* (1988) 204 Cal.App.3d 1351, however, the court explained that "alter ego allegations provide a theory of recovery, but not a new cause of action." It thus found that adding the SG defendants "did not violate the stipulation as no new claims were added." The court overruled the demurrer.

### 2. Analysis

Code of Civil Procedure section 473, subdivision (a)(1) provides that a trial court "may, in furtherance of justice, and on any terms as may be proper, allow a party to amend any pleading." We review the court's ruling on Doskocz's motion to amend the complaint for abuse of discretion. (*Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 242.)

We conclude that the SG defendants have forfeited their challenge to this ruling because they did not provide it in the appellate record. (Cal. Rules

27

of Court, rule 8.124(b)(1)(B) [appendix must include items "necessary for proper consideration of issues"]; *Mountain Lion Coalition v. Fish & Game Com.* (1989) 214 Cal.App.3d 1043, 1051, fn. 9 ["if the record is inadequate for meaningful review, the appellant defaults and the decision of the trial court should be affirmed"].)

Even if not forfeited, we see no basis to conclude that the court abused its discretion in granting the motion. The SG defendants renew their argument that the amendment added "new claims" in violation of the stipulation from the federal action. But alter ego allegations do not create a new claim or cause of action, they are instead a "procedural device" used to hold the alter ego liable. (*Leek v. Cooper* (2011) 194 Cal.App.4th 399, 419 [explaining alter ego liability is "not a substantive claim"]; *Hennessey's Tavern, Inc. v. American Air Filter Co.*, *supra*, 204 Cal.App.3d at p. 1359 [same].)

To the extent the SG defendants challenge the trial court's ruling on demurrer, our review is de novo but reaches the same result. (*San Bernardino County v. Superior Court* (2015) 239 Cal.App.4th 679, 683.) On demurrer, the SG defendants repeated the argument (previously made by ALS in opposing the motion to amend) that the new alter ego allegations were barred by the stipulation. But the SG defendants show no basis to enforce that agreement between Doskocz and *ALS*. Third parties may have such a basis where (1) the third party benefits from the agreement, (2) the provision of such a benefit was the "motivating purpose" of the contracting parties, and (3) permitting enforcement "is consistent with the objectives of the contract and the reasonable expectations of the contracting parties." (*Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 830.) Here, the SG defendants assert—without any supporting facts or law—that they were

28

intended third party beneficiaries of the stipulation because Doskocz "used the language therein" to add them into the state action. This unsupported assertion does not persuade us that the requirements for third party enforcement are satisfied here. Even if it did, we agree with the trial court that the amendment did not run afoul of the stipulation because, as explained above, the alter ego allegations did not add any "new claims."

In short, we conclude that the trial court did not abuse its discretion in granting Doskocz's motion to amend the complaint and did not err in overruling the SG defendants' demurrer.

## F. *No Abuse of Discretion on Attorney Fees Award*

### 1. Additional Background

After the statement of decision was issued, class counsel moved for attorney fees under Code of Civil Procedure section 1021.5 on the grounds that the litigation had conferred a substantial benefit on the public and a large class of Californians. They requested a total $1,173,816 award: $939,053 in fees with a 1.25 multiplier that included time spent by lead counsel and attorneys from both Cotchett, Pitre & McCarthy, LLP (Cotchett) and Housing and Economic Rights Advocates (HERA). The motion included declarations from lead counsel, Cotchett, and HERA describing work performed in the action. Declarations from lead counsel and HERA also included time records. ALS and the SG defendants opposed the motion. Among other things, the SG defendants argued that the requested fee award was not reasonable or properly apportioned to them.

The court granted class counsel's motion and awarded $1,173,816 in fees. It found that the litigation "conferred a significant benefit on a substantial number of people, including the Class Members in this case and the General Public" and the subject matter "implicated the public interest

29

because it vindicated and enforced important assessment collection provisions of the Davis-Stirling Act," including sections 5655(a) and 5720.

The court found that the hours spent by class counsel were "reasonable, taking into account the history, duration, and context of this litigation, including the issues presented, motions practice, Defendants' opposition, and the extent of litigation." It exercised its discretion to apply the 1.25 multiplier upon considering the factors from *Serrano v. Priest* (1977) 20 Cal.3d 25, including "novelty and difficulty of the questions and skill displayed by Class Counsel in presenting them, and the contingent nature of the fee award."

### 2. Analysis

Code of Civil Procedure section 1021.5 provides that a court may award attorney fees to the prevailing party "in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

Here, the SG defendants challenge the trial court's finding on the first prong of this provision: that the action conferred a significant benefit on the general public or a large class of persons. We review this finding for abuse of discretion. (See *Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1213 [determination to award fees under Code Civ. Proc., § 1021.5 reviewed for abuse of discretion where appeal turns on factual findings or exercise of discretion rather than questions of law].)

We find no such abuse of discretion here. The SG defendants focus on the minimal financial gain from dividing the restitution award of $156,783 over 6,000 class members, but ignore the other benefits achieved by the action. (See *City of Oakland v. Oakland Police & Fire Retirement System* (2018) 29 Cal.App.5th 688, 700 [explaining that considerations beyond prevailing party financial benefit may be relevant].) The judgment included not only restitution, but injunctive relief prohibiting ALS from certain practices and requiring it to recalculate balances on *all* open accounts. More importantly, the action conferred a significant public benefit because, as detailed above, it vindicated important homeowner rights under sections 5655(a) and 5720.

Nor are we persuaded by the SG defendants' arguments challenging the *amount* of attorney fees awarded here. (*Robles v. Employment Development Dept.* (2019) 38 Cal.App.5th 191, 199 [amount of fees awarded under Code Civ. Proc., § 1021.5 reviewed for abuse of discretion].) First, the SG defendants argue that Cotchett and HERA did not provide "detailed billing" in support of their request. " 'California courts do not require detailed time records, and trial courts have discretion to award fees based on declarations of counsel describing the work they have done and the court's own view of the number of hours reasonably spent.' " (*Syers Properties III, Inc. v. Rankin* (2014) 226 Cal.App.4th 691, 698.) Here, Cotchett and HERA provided declarations describing the type of work performed by their attorneys and the hours spent on such work. HERA also attached time entries with a general description of the category of work performed. This was sufficient for the court to determine that the hours requested by class counsel were reasonable.

Second, the SG defendants argue that the amount was unreasonable because multiple attorneys attended hearings and depositions in this action. We agree with the general principle that a trial court can exercise its discretion to limit an award of fees for " 'unjustified duplication of work' " across different counsel or law firms. (*Donahue v. Donahue* (2010) 182 Cal.App.4th 259, 271.) But the SG defendants do not detail how any particular time incurred by class counsel was unjustified. On the contrary, lead counsel, Cotchett, and HERA all provided declarations stating they had reduced or removed entries for duplicative efforts and written off at least 496 hours spent in this litigation.

Third, the SG defendants argue that there was no basis for the hourly rates claimed by class counsel or the 1.25 multiplier applied here. "In determining hourly rates, the court must look to the 'prevailing market rates in the relevant community' " and "should also consider the experience, skill, and reputation of the attorney requesting fees." (*Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1009.) " 'Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate.' " (*Ibid.*) Here, lead counsel, Cotchett, and HERA provided declarations detailing their hourly rates and stating that such rates were at or below market rates for attorneys with comparable experience and skill. Lead counsel also provided examples of his hourly rates determined in previous fee awards. Moreover, a trial court "may rely on its own knowledge and familiarity with the legal market in setting a reasonable hourly rate." (*Ibid.*; see also *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096 [" 'The value of legal services performed in a case is a matter in which the

trial court has its own expertise.' "].) The trial court did not abuse its discretion in finding class counsel's requested rates to be reasonable. As for the multiplier, courts have the discretion to apply such a multiplier based on a variety of factors, including novelty and difficulty of the questions presented in the action. (*Serrano v. Priest*, *supra*, 20 Cal.3d at p. 49.) The trial court did not abuse its discretion in applying the 1.25 multiplier requested here based on novel and difficult legal issues in this litigation, including whether waiver of section 5655 was void as against public policy.

Finally, the SG defendants argue that the attorney fees should have been apportioned, with ALS being solely responsible for fees incurred before the alter ego allegations were added to the first amended complaint in 2020. "[T]rial courts have discretion not only in setting the amount of an award of attorney fees, but in allocating the award among various defendants based on their relative culpability." (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 97–98.) Here, however, the SG defendants were determined to be the alter egos of ALS and thus held liable for its obligations. (*Leek v. Cooper*, *supra*, 194 Cal.App.4th at p. 419.) Accordingly, there was no distinction between the liability of the defendant entities here, and work performed to pursue and prove ALS's liability was common to the SG defendants.

In sum, we conclude that the trial court did not abuse its discretion in awarding $1,173,816 in fees to class counsel against ALS and the SG defendants jointly and severally.

## III.  DISPOSITION

The judgment is affirmed.  Doskocz is entitled to her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)



CASTRO, J.*



WE CONCUR:



HUMES, P. J.



BANKE, J.



A166299
*Doskocz v. ALS Lien Services*

---

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:        Contra Costa County Superior court

Trial Judge:        Hon. Barry Baskin

Counsel:

Soltman, Levitt, Flaherty & Wattles LLP, Steven B. Soltman and Steven S. Nimoy for Defendant and Appellant ALS Lien Services.

Murchison & Cumming, LLP, Dan L. Longo and Matthew E. Voss for Defendants and Appellants SwedelsonGottlieb, David Swedelson, and Sandra Gottlieb.

Housing and Economic Rights Advocates, Arthur D. Levy, Gina di Giusto and Daniel F. Alper; and Cotchett, Pitre & McCarthy, LLP, Justin T. Berger for Plaintiffs and Respondents.